**Andrew BYDLON, John D. Hanson, Joseph Perko, Martin Skala, Jr., and William Zupancich**

**v.**

**UNITED STATES.**

**TAITO AHOLA, Toimi Ahola, Leithold Seaplane Service, Inc., Arne Lynn, Jacob Pete, and Elwyn West**

**v.**

**UNITED STATES.**

**Nos. 421-55, 480-55.**

United States Court of Claims.

July 15, 1959.

[redacted]

[redacted]

William W. Essling, St. Paul, Minn., Thomas Marlone, St. Paul, Minn., and Willard S. Domich, Ely, Minn., on the briefs, for plaintiffs.

Thomas L. McKevitt, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

PER CURIAM.

This is an action by the plaintiffs for the taking of their property as a result of the proclamation of Executive Order No. 10092, dated December 17, 1949, which banned and prohibited travel by air below 4,000 feet over the roadless areas of the Superior National Forest in northern Minnesota.

This case was referred by the court, pursuant to Rule 45(a), 28 U.S.C.A., to Trial Commissioner C. Murray Bernhardt, with directions to make findings of fact and recommendations for conclusions of law which he has done in his report filed September 8, 1958.

The court, having considered the evidence, the briefs and argument of counsel, adopts the findings and opinion of the Trial Commissioner with slight modifications.

The plaintiffs, Zupancich and Skala, are entitled to recover just compensation in the respective amounts of $25,000 and $30,000, with interest thereon at four percent per annum from January 1, 1952, to date of payment as part of just compensation, and judgment will be entered to that effect. The petition as to the other plaintiff in case No. 421-55 will be dismissed, and the petition in case No. 480-55 will also be dismissed.

It is so ordered.

WHITAKER, Judge, dissenting in part and concurring in part, in which District Judge ALBERT V. BRYAN (sitting by designation) joins:

The *per curiam* opinion of the majority adopts the opinion of the Trial Commissioner with certain modifications. That opinion determines the right to compensation of the plaintiffs who owned resorts within the area upon whether or not they had a way of necessity through

the air space over the Superior National Forest in order to reach their properties. The Commissioner concluded that plaintiffs Zupancich and Skala did have such a way of necessity, but that plaintiffs Pete and Hanson did not. Judgment was rendered in favor of Zupancich for $25,000, and in favor of Skala for $30,000. The petitions of Pete and Hanson were dismissed.

I think the amount of the judgments rendered in favor of Zupancich and Skala are correct, but that it was error to dismiss the petition as to Pete and Hanson. I think this was error because I do not think their rights depend on whether or not they had a way of necessity. I think all of the resort owners had a right of access to their properties by air, because the air is a public highway. This right of access by air is a property right, which cannot be taken away from them without the payment of just compensation, when it is taken for the sole purpose of preserving this area as a wilderness area, as it admittedly was.

The right of access to one's property over established public highways is a property right appurtenant to the property abutting on the highway. The rights of the public in general in public highways and the rights of owners of property abutting thereon are extensively discussed in an opinion by Mr. Justice Harlan, speaking for a unanimous court, in Donovan v. Pennsylvania Co., 199 U.S. 279, beginning on page 300, 26 S.Ct. 91, beginning on page 96, 50 L.Ed. 192. The entire discussion is of interest, but, for the sake of brevity, I quote only the following quotation from Dillon on Municipal Corporations, 199 U.S. at pages 302–303, 26 S.Ct. at page 98, of the Court's opinion:

"The general doctrine is correctly stated in Dillon on Municipal Corporations: 'For example, an abutting owner's right of access to and from the street, subject only to legitimate public regulation, is as much his property as his right to the soil within his boundary lines. * * * When he is deprived of

such right of access, or of any other easement connected with the use and enjoyment of his property, other than by the exercise of legitimate public regulation,' he is deprived of his property.'"

This question is elaborately discussed in the New York Elevated cases (Story v. New York Elevated R. Co., 90 N.Y. 122), which is referred to with approval by the Supreme Court of the United States in Sauer v. City of New York, 206 U.S. 536, 545, 27 S.Ct. 686, 51 L.Ed. 1176. In the Sauer case this right of access to one's property over the public highways is fully recognized, but the distinction is there drawn between an impairment in the right of access brought about by improvements in the public highway for the purpose of travel, and the imposition of an additional use upon the highway which was not for the purpose of public travel, but for some other purpose. The sovereign is not liable for impairments which arise from its improvements to facilitate travel, but it is liable for damage which results from the imposition of an additional use.

The same principle applies to navigable waters. An owner whose property is riparian to a navigable stream has the right of access to the navigable stream (Yates v. Milwaukee, 10 Wall. 497, 504, 505, 19 L.Ed. 984; United States v. River Rouge Imp. Co., 269 U.S. 411, 418, 419, 46 S.Ct. 144, 70 L.Ed. 339), but this right of access is subject to the dominant servitude of the United States to take all necessary steps to improve navigation, and may be taken away, with impunity, in the course of such improvements.

In United States v. Commodore Park, Inc., 324 U.S. 386, 390, 65 S.Ct. 803, 89 L.Ed. 1017, the Government dredged a tidewater navigable bay and deposited the dredged materials in the mouth of a navigable arm of the bay called Mason Creek. The residential property owners on Mason Creek were thus deprived of access to navigable waters and, accordingly, the value of their property decreased. The Court refused recovery, basing

its refusal on the ground that plaintiff's riparian rights were subservient to the Government's power to control commerce. The Court states at page 391 of 324 U.S., at page 805 of 65 S.Ct.:

"* * * As against the demands of commerce, an owner of lands adjacent to navigable waters, whose fast lands are left uninvaded, has no private riparian rights of access to the waters * * *. Riparian rights of access to navigable waters, cannot, as against the government's power to control commerce, be bought and sold."

However, this superior right or servitude which the Government possesses relieves it of its duty to pay compensation *only* when it acts under its power to regulate and improve commerce. Yates v. Milwaukee, supra, and United States v. River Rouge Imp. Co., supra. If it acts for some other purpose, such as the reclamation of arid lands, then it must pay just compensation for the taking of riparian rights. Gerlach Live Stock Co. v. United States, 76 F.Supp. 87, 111 Ct. Cl. 1. Cf. State of Kansas v. State of Colorado, 206 U.S. 46, 85–86, 27 S.Ct. 655, 51 L.Ed. 956. The Constitution vests in the national Government dominant power over the use of navigable waters only for the purpose of regulating commerce on them. If the Government appropriates them to its own use for some other purpose, or diverts them from the riparian owner for the use of another, it does so under its power of eminent domain, the exercise of which requires the payment of just compensation.

The air space over the United States is also a public highway, which the owner of property has the right to use to secure access to his property. Congress in section 3 of the Civil Aeronautics Act of 1938 (52 Stat. 973; 49 U.S.C.A. § 401, et seq.) declared: "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the navigable air space of the United States."

As in the case of navigable waters, the nation has a dominant servitude in the air for the purpose of air commerce. It gets this servitude over the air, as it does over navigable waters, from the provision in the Constitution giving it the power to regulate interstate and foreign commerce. Braniff Airways, Inc. v. Nebraska State Board, 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967. The ownership of the air space is in the states or in the owner of the surface, United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; Matson v. United States, Ct.Cl., 171 F.Supp. 283, opinion by Mr. Justice Reed, (ret.) but it is subject to this servitude in the United States for the purpose of regulating commerce.

The right of the United States in the air space above the surface of the United States was carefully stated in Braniff Airways, Inc. v. Nebraska State Board, supra, from which I quote, 347 U.S. at pages 595–597, 74 S.Ct. at page 761:

"These Federal Acts regulating air commerce are bottomed on the commerce power of Congress, not on national ownership of the navigable air space, as distinguished from sovereignty. In reporting the bill which became the Air Commerce Act, it was said:

" 'The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or nonnavigable waters. The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil.' H.R.Rep. No. 572, 69th Cong., 1st Sess., p. 10.

"The commerce power, since Gibbons v. Ogden, 9 Wheat. 1, 193, 6

L.Ed. 23, has comprehended navigation of streams. Its breadth covers all commercial intercourse. But the federal commerce power over navigable streams does not prevent state action consistent with that power. Gilman v. City of Philadelphia, 3 Wall. 713, 729, 18 L.Ed. 96. Since, over streams, Congress acts by virtue of the commerce power, the sovereignty of the state is not impaired. State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 534, 61 S.Ct. 1050, 85 L.Ed. 1487. The title to the beds and the banks are in the states and the riparian owners, subject to the federal power over navigation." Cf. Matson v. United States, supra.

It may be said, therefore, on the analogy of the public roads and navigable waters, that while the owner of property has the right of access to it by air, this right of access is subject to the dominant servitude in the United States to regulate commerce in the air. But if a ban on the flight of planes within a certain area is not designed to promote commerce, the defendant must respond in damages for the taking of plaintiffs' means of access to their properties by air, long recognized and long used theretofore. It is only by virtue of the clause of the Constitution, art. 1, § 8, cl. 3, giving the Federal Government the power to regulate commerce that the Congress is authorized to assert sovereignty in the air space, and, hence, it has a dominant interest therein only for the purpose of regulating commerce.

While the airban was promulgated pursuant to section 4 of the Air Commerce Act of 1926 (44 Stat. 568, 49 U.S.C.A. § 174),[1] it is manifest—indeed, it is conceded by the defendant—that it was not promulgated to promote air commerce or for the national defense, but to establish this area, partly government-owned and partly privately owned,

as a wilderness area. Having been established for this purpose, the United States cannot escape liability for the taking of plaintiffs' right of access to their properties by air, which was the necessary result of the airban.

In Gerlach Live Stock Co. v. United States, supra, we held the United States liable for riparian rights taken in the carrying out of an irrigation project. The Supreme Court did not expressly rule on this question (339 U.S. 725, 726, 70 S.Ct. 955, 94 L.Ed. 1231), since the Reclamation Act directed the payment for property taken. I do not doubt, however, that the United States cannot escape the mandate of the Constitution that private property shall not be taken without the payment of just compensation where the purpose of the taking was to preserve a certain area as a wilderness, and not to promote commerce.

The Court of Appeals for the 8th Circuit in Perko v. United States, 204 F.2d 446, sustained an injunction against the violation of the ban, although it recognized that it "injures the value of their properties for resort purposes;" but, it said, "that question is not involved in this case except indirectly." I do not deny the Government's power to issue the ban, but I say it must pay just compensation for the consequent deprivation of plaintiffs' right of access to their properties by air and the consequent reduction in value of their properties.

I do not think liability should be predicated on the doctrine of ways of necessity. A way of necessity over the land of the grantor arises from and depends upon the conveyance of land to the grantee. If the only means of access to the land conveyed is over lands remaining in the hands of the grantor, it is presumed from the deed of conveyance that the grantor intended also to convey this means of access; or, if it is reasonable to infer that at the time of the conveyance the grantee must have depended upon this

1. Section 4 reads: "The President is authorized to provide by Executive order for the setting apart and the protection of airspace reservations in the United States for national defense or other governmental purposes and, in addition, in the District of Columbia for public safety purposes. * * * "

means of access, such an easement is to be implied.

So, no way of necessity by air can be inferred from the grants by the Government of lands within the Superior National Forest, unless at the time of the grants it was reasonable to suppose that the grantees depended upon the use of such means of access to their properties. If at the time of the grants by the Government to the present owners of land within this area, or to their predecessors in title, such means of access was unknown, or rarely used, it cannot be inferred that the Government intended to convey such an easement. The dates of the grants by the Government of the various parcels of land within the area, except the one to Hanson, is not disclosed by the record and, hence, we cannot determine whether or not it was intended by the parties that an easement of flight over lands remaining in its hands should be conveyed.

Judging from the Government's longstanding policy of acquisition of lands in this area, the acquisition of land therein from the Government by private individuals could not have taken place much later than 1930, and probably much before that. If this is true, it would seem extremely doubtful that an easement of flight would be implied. Aviation was then in its infancy and it would not have been reasonable to imply that it was a method of ingress and egress contemplated by the parties.

In my opinion plaintiffs' rights depend not on an easement to be implied from the grants to them, or to their predecessors in title, by the Government; but rather on the fact that the air space is a public highway, through which every property owner may travel in going to and from his property. If any of the plaintiffs have been deprived of this means of access, they are entitled to recover, even if another means of access is available to them.

That another means of access is available is pertinent, not to the question of liability, but only to the amount of the damage.

I would give judgment, not only to Zupancich and Skala, but also to Pete and Hanson. The Commissioner finds that the value of Pete's property was depreciated in the amount of $4,000 by the airban, and the value of Hanson's property by $15,000. I think these findings are correct and I would give them judgment in these amounts.

## Opinion of Commissioner

On December 17, 1949, the President, under the cited authority of the Air Commerce Act of 1926 (44 Stat. 570; 49 U.S.C.A. § 174), issued Executive Order No. 10092 which, effective as to the present plaintiffs on January 1, 1952, prohibited flights below 4,000 feet over the so-called roadless areas of the Superior National Forest in northern Minnesota. The plaintiffs, Elwyn West and Leithold Seaplane Service, Inc., were in the commercial airline business at Ely, Minnesota, and their business consisted almost exclusively of flights into the roadless areas. The other plaintiffs own and operate resort properties on lakes situated within the region covered by the airban, and all but two of them, until stopped by the airban, traveled to their resorts by seaplane as the habitual, permitted, most economical and practical method of access for themselves, their guests, and supplies. The plaintiffs sue to recover just compensation for the depreciation in the value of their respective properties brought about because of the airban.

The Superior National Forest was established in 1909 by presidential proclamation, and enlarged since. It contains 3,000,000 acres, extends 110 miles along the Canadian border, and adjoins the 1,000,000-acre Quetico National Forest across the border in Canada. Since at least 1926 it has been the official plan of the Forest Service to set aside certain parts of the Superior National Forest as a primitive area, free of roads and other vestiges of civilization, for the enjoyment of the vacationer seeking the advantages of one of the last remaining wilderness areas in the United States. It was envisaged that the canoe and foot

travel would be the sole means of transportation into this perpetuated state of nature.

The constancy of this policy has been evidenced through the years by various executive pronouncements and Congressional enactments from 1926, when the Secretary of Agriculture announced an administration policy for the Superior National Forest recognizing the exceptional values of large portions of it "for the propagation of fish and game, for canoe travel, and for affording recreational opportunities to those who seek and enjoy wilderness conditions," to 1948 when Congress passed the Thye-Blatnik Act (16 U.S.C.A. §§ 577c–577h; 62 Stat. 568–570) and appropriated money for the Forest Service to purchase private property in the roadless areas but exempted from condemnation such properties as the resorts in suit unless the owners consented to condemnation. In the latter year the Secretary of Agriculture reaffirmed in slightly altered form a plan of management for the roadless areas which had been first proposed in 1939 by the Forest Service. The reaffirmed plan delineated the precise boundaries of three roadless areas in the Forest, of which the Superior Roadless Area was one. Collectively, these various pronouncements and laws regulated and restricted logging, prohibited all but temporary roads, prohibited alterations of lake levels, preserved the rights of private owners within the roadless areas and impliedly assured them of continued rights of ingress and egress, sanctioned and regarded aircraft flights to resorts in the roadless areas as not serious threats to the wilderness effect, but viewed with marked disfavor the increasing prevalence of airborne fishing excursions landing and taking off from lakes in the roadless areas, and recognized that many of the resorts in question had developed "in a perfectly lawful manner and from quite legitimate motives."

The plaintiffs established and developed their properties largely during the decade of the 1940's. While they must have been aware much earlier of the roadless policy in that part of the Forest containing their resorts, the tenor of official expressions made them feel rightfully sure of the continued availability of access by seaplane to and from the resorts. The 1949 Executive Order banning flights was candidly admitted at trial to be an effort to eliminate those resorts which refused to sell out to the Forest Service so as to serve the strictly aesthetic purpose of keeping the forest virginal, although the order itself was couched in less revealing terms as an exercise of regulatory authority under the Air Commerce Act of 1926. By the time of trial the defendant had purchased 14 miscellaneous resorts in the roadless area and there remained unsold about 18 privately owned resort and residential properties having substantial improvements, including the four resorts in suit. Both of the plaintiff airlines were forced to close down, one of them, West, doing so only when the Government impounded his planes in July 1953 for refusal to obey a court order enjoining further flights.

The legality of the Executive Order has been tested and sustained in court proceedings involving several of the present plaintiffs. United States v. Perko, and United States v. Zupancich, decided by the United States District Court in Minnesota on September 26, 1952 (108 F.Supp. 315), affirmed on appeal (Perko v. United States, 8 Cir., 204 F.2d 446, certiorari denied 346 U.S. 832, 74 S.Ct. 48, 98 L.Ed. 355). These were injunction proceedings brought against plaintiffs Zupancich, Skala, and West, and another resort owner, for repeated violations of the airban order subsequent to its effective date. In granting the injunctions the court recognized that the effect of the airban would be to discourage patronage, and pointedly stated that the question of just compensation for the resort owners by reason of the diminution in value of the resorts was not before the court. Whether or not these decisions may be res judicata here as to the validity of the airban order, the reasoning advanced is persuasive and is

adopted here to reach the same result, still leaving unresolved the question of compensability.

Before proceeding further, the claims of the two airline operators, Leithold and West, should be considered. These plaintiffs had no property within the roadless area. It is well-settled that consequential damages resulting from lawful governmental action cannot form the basis of a compensable taking. Mitchell v. United States, 267 U.S. 341, affirming 58 Ct.Cl. 443, Mullen Benevolent Corporation v. United States, 290 U.S. 89, 94–95, 54 S.Ct. 38, 78 L.Ed. 192; Bothwell v. United States, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238; Omnia Commercial Company v. United States, 261 U.S. 502, 510–511, 43 S.Ct. 437, 67 L.Ed. 773, affirming 56 Ct.Cl. 392; Southern Counties Gas Co. of Cal. v. United States, 141 Ct.Cl. 28, 157 F.Supp. 934. Moreover, as to Leithold, the evidence fails to establish a loss (finding 18c).

As to the resort-owning plaintiffs it is first necessary to ascertain whether they at any time enjoyed access by air as a matter of right, for if they had no such right they cannot claim compensation for its suspension or withdrawal. The plaintiffs contend in brief that they had a right to use the navigable airspace as members of the public so long as it does not conflict with the sovereign uses of the Federal Government in the same airspace, and that since the creation of the airspace reservation over the roadless areas by the Executive Order established an absence of use rather than otherwise, the plaintiffs' right to use it for access purposes remains intact. It seems unnecessary to engage in an extended and perhaps profitless discussion of the ownership in, use of and sovereignty over the airspace as between the Federal Government, state governments, and citizens. The right of at least some of the plaintiffs may be considered in the light of the traditional doctrine of ways of necessity.

Of the four resort-owning plaintiffs, the access problem of Zupancich is the most aggravated and difficult since and because of the Executive Order banning flights. With access by air he enjoys an unrivaled location whose very remoteness adds to its appeal to vacationers. Since the cessation of flights he has had to bring in his guests and supplies over 41 miles of lakes, portages, and dangerous rapids via a series of boats and land vehicles. Zupancich resisted the airban strenuously. Defying it initially by flying his guests and supplies in until July 1953, he stopped only upon exhaustion of court procedures. United States v. Zupancich, supra. Thereafter he and another resort owner, one Perko, used for access to their properties an old logging road which, under permit by the United States issued to the Northwest Paper Company in 1950, was extended a few miles into the roadless area. Over this road Zupancich and Perko drove vehicles and construction equipment in order to reach waters accessible to their properties, even violating a locked gate which had been erected at the boundary of the roadless area at the instigation of the United States. In May 1955 the District Court in Perko v. Northwest Paper Company, Inc., D.C., 133 F.Supp. 560, denied a temporary injunction sought by plaintiffs to restrain defendants from preventing this means of access. Disregarding this setback the plaintiffs continued to use the road, until in July 1955 the District Court in United States v. Perko, D.C., 133 F.Supp. 564, issued a temporary injunction prohibiting such use. Since these events Zupancich has been forced to follow procedures described in finding 17a to reach his resort. This alternate route is excessively inconvenient, dangerous and expensive. The Forest Service apparently has no control over this particular route which skirts the Canadian border along navigable waters. Presumably the only method of access which would receive the sanction of the Forest Service would involve using wilderness trails and waters by packhorses, canoes, and walking. Such a method of access would be unreasonable and would destroy Zupancich's property for resort purposes. The resort was planned exclusively with air

access in mind. No other means of access permitted under Forest Service rules and remotely suited to requirements is available.

Does Zupancich have a right analogous to and having incidents similar to those of a way of necessity to his property by air above neighboring land owned by the defendant, the State of Minnesota, and other private owners? The Act of June 4, 1897, provided for the establishment and administration of the national forests. Section 1, Chapter 2, of the Act (16 U.S.C.A. § 478; 30 Stat. 36) assured to settlers inside the national forests means of egress and ingress across the same, "and such wagon loads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of Agriculture." All of the plaintiffs enjoy rights of access to at least this degree. Even without this statutory assurance, it is the universal rule that the grantee of property hemmed in by the grantor's property has a right-of-way of necessity across the latter, on the rule of public policy that whenever property is conveyed the grantor also conveys by implication whatever is necessary to its beneficial use, 17A Am.Jur. 669, and cases n. 17. A conflict of authority exists as to the degree of necessity required to imply a way of necessity. A reasonable necessity is the general rule, although respectable authority supports the requirement of absolute necessity. It is agreed that the alternative access must be something more than merely inconvenient for a way of necessity to exist. Rischall v. Bauchmann, 132 Conn. 637, 46 A.2d 898, 165 A.L.R. 559; Backhausen v. Mayer, 204 Wis. 286, 234 N. W. 904, 74 A.L.R. 1245; Littlefield v. Hubbard, 124 Me. 299, 128 A. 285, 38 A.L.R. 1306. Contra, United States v. Rindge, D.C., 208 F. 611.

Section 484 of the Restatement on Property Servitudes suggests the entirely reasonable theory that the normal development of Zupancich's forest property into a wilderness resort entitles him to whatever means of communication that are afforded by modern technology and reasonably consistent with the Government's objectives in preserving the undefiled nature of the roadless area. In determining the necessity of a particular way, consideration must be given to the uses to which the property would naturally be put. Feoffees of Grammar School in Ipswich v. Proprietors of Jeffrey's Neck Pasture, 174 Mass. 572, 55 N.E. 462. The record gives reason to believe that the Forest Service found brief flights to and from the few resorts in the roadless area by small seaplanes to be far less detractive from the defendant's general aesthetic aims than the practice of the airline plaintiffs conducting airborne fishing parties which landed on the lakes to fish briefly from pontoons of the plane or from portable collapsible rafts.

What has been said as to Zupancich's right of access by air applies with almost equal force to the plaintiff Skala, whose resort lies along the same route as the former's but is ten miles less in distance. Skala was not party to all of the prior litigation involving Zupancich and Perko, but the outcome of that litigation foreclosed him as much as it did the unsuccessful litigants. The large expenditures he was forced to make in order to provide a transportation system as the sole alternative to banned flights, which are mentioned in finding 16b, plus the questionable nature of his right to continue using this sole remaining means of access, condemn it as being unreasonable. The fact that his resort has enjoyed mounting receipts through the years since the airban is more of a tribute to his sales talents than a reason to consider his access route feasible. Had his right to use airplanes continued, he not only would have been saved a large expense but would undoubtedly also be enjoying a larger patronage.

The plaintiff Pete cannot claim that access by air to his resort is a matter of necessity to the same degree as Zupancich and Skala. In establishing his

resort he did not rely on seaplane service as his principal means of access. As stated in finding 15c at most only a fourth of his guests arrived by air in any season. His principal means of access then, and sole means now, is a six-mile road from Ely, followed by a six and one-half mile trip across Fall Lake and four miles across the Four Mile Portage. Pete's resort lies at the end of the Four Mile Portage. The Portage is owned by the Government which has promised it will remain available for vehicular traffic so long as it is needed. Were its use to be terminated by the Government so as to deprive this plaintiff of this link in his transportation chain, the result might be different. Undoubtedly the added convenience of being able to fly in guests and supplies would increase his patronage and receipts to an unknown extent, but the existing means of access is not so inconvenient as to give him a way of necessity by air in the context of the decisions, even though deprivation of it has caused a loss in market value of his resort. To reach Hanson's resort the same route is followed, except that he must travel 13 miles by water beyond the Four Mile Portage on Basswood Lake. True, in establishing his resort Hanson's plans for transportation centered exclusively on seaplane service already available and sanctioned by the authorities at that time. Because of this and other matters described in the findings the airban has had a more serious effect on Hanson than upon Pete. Nevertheless, it cannot be said that the degree of his inconvenience and expense is such as to give him a way of necessity via air.

In residue, there are left only the claims of Zupancich and Skala. That the way of necessity to and from their properties was a property right whose deprivation by Government action can be a taking is obliquely shown in Friend v. United States, 30 Ct.Cl. 94, where at page 105 it was said that "A private easement is property within the meaning of the law as much as the physical substance from which it springs." Access

was considered a property right more recently by this court in Boush Creek Land Corporation v. United States, 68 Ct.Cl. 56, and Fonalledas v. United States, 107 F.Supp. 1019, 123 Ct.Cl. 483. That is also the law of Minnesota, which perforce applies in these actions. United States ex rel. and for Use of Tennessee Valley Authority v. Powelson, 319 U.S. 266, 279, 63 S.Ct. 1047, 87 L.Ed. 1390; Adams v. Chicago, B. & N. R. Co., 39 Minn. 286, 39 N.W. 629, 1 L.R.A. 493; State by Burnquist v. Miller Home Development, 243 Minn. 1, 65 N.W.2d 900, 905, 50 A.L.R.2d 1377; State v. Longyear Holding Co., 224 Minn. 451, 29 N.W.2d 657. It is no longer the rule that there must be a physical invasion of property to constitute a taking. United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539. If such rights are divested or impaired by the sovereign, just compensation must be paid. Pike Rapids Power Co. v. Minneapolis, St. Paul & S. S. M. R. Co., 8 Cir., 99 F.2d 902.

The defendant argues nonliability because the damages were merely the consequences of a valid regulation. As a generality this is true. The validity of the Executive Order constituting the airban in these cases was upheld in United States v. Perko, and United States v. Zupancich, both supra, and, as has been said, the logic of those opinions is convincing. That is not to say, however, that the order in the instant cases did not create a liability. It was recognized in United States v. Central Eureka Mining Company, 1958, 357 U.S. 155, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228, that "action in the form of regulation can so diminish the value of property as to constitute a taking," and that "Traditionally, we have treated the issue as to whether a particular governmental restriction amounted to a constitutional taking as being a question properly turning upon the particular circumstances of each case," citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322.

The Air Commerce Act of 1926, upon which the Executive Order was predicated, draws its vitality from the commerce clause of the Constitution. Section 4 gives the President the power to establish airspace reservations "for national defense or other governmental purposes." 49 U.S.C.A. § 174; 44 Stat. 570. The airspace reservation established by the order over the roadless areas of the Superior National Forest was not an exercise of the commerce power. It was an exercise of the federal police power for the purpose of protecting the public welfare by means of preserving for public recreational use the aesthetic values of the wilderness. Where the value of private property is destroyed in the exercise of police power, sometimes compensation must be paid (Conger v. Pierce County, 116 Wash. 27, 198 P. 377, 399, 18 A.L.R. 393; Bacich v. Board of Control of Calif., 23 Cal.2d 343, 144 P.2d 818, 824), and sometimes not (Mugler v. State of Kansas, 123 U.S. 623, 664, 668, 669, 8 S.Ct. 273, 31 L.Ed. 205). Police power may be exercised for the preservation of aesthetic values, but just compensation must be paid to the owners whose property is taken. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27. Compensation need not be paid where there is an extreme and compelling emergency requiring the exercise of such power to conserve the safety, morals, health, and general welfare of the public. Conger v. Pierce County, supra. Aesthetic considerations have been held to be a luxury rather than such a necessity as would justify the taking of private property without compensation. City of Passaic v. Paterson Bill Posting, Adv. & S. P. Co., 72 N.J.L. 285, 62 A. 267. The rule is well-expressed by the late Justice Holmes in Pennsylvania Coal Co. v. Mahon, supra [260 U.S. 393, 43 S.Ct. 159]:

"* * * As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon particular facts. * * *

"The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * *."

Consistent with such a view are Jackson v. United States, 103 F.Supp. 1019, 122 Ct.Cl. 197, 206, and Gerlach Livestock Co. v. United States, 76 F.Supp. 87, 111 Ct.Cl. 1, 71 (affirmed, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231).

It thus seems clear that the United States has taken, under the guise of its police power, a property right of the plaintiffs Zupancich and Skala consisting of a way of necessity to their properties. The Thye-Blatnik Act, supra, prohibits the condemnation of plaintiffs' properties without their consent, and that consent was not given. The plaintiffs have refused to sell at prices offered by the Forest Service. Obviously the Executive Order was devised to accomplish as a last resort what the Government was powerless to do in more normal fashion —compel the evacuation of the plaintiffs' properties. But this, as a valid exercise of the police power, cannot be done without payment of just compensation. The fair market values of the properties of plaintiffs Zupancich and Skala, exclusive of removable personalty, were $100,000 and $130,000, respectively, as of January 1, 1952, the effective date of the airban. As a result of the airban, those values were reduced as of that date to $75,000 and $100,000, respectively. The plaintiffs Zupancich and Skala are entitled to be paid just compensation in the respective amounts of $25,000 and $30,000, with interest thereon at four percent per annum from January 1, 1952, as part

of just compensation. The claims of the other plaintiffs should be dismissed.

### Findings of Fact

The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. These consolidated proceedings were originally brought by eight resort owners (representing seven resorts), two owners of commercial flying operations, and one owner of a boat rental business to recover just compensation for diminution in value of their properties allegedly resulting from establishment of an airspace reservation over a portion of the Superior National Forest (hereinafter referred to alternatively as the Forest) in northern Minnesota. Plaintiffs Bydlon, Perko, Taito and Toimi Ahola and Lynn are no longer parties to these actions. All of the individual plaintiffs are citizens of the United States and residents of Minnesota, except Elwyn West, who is a resident of Wisconsin.

2. The Superior National Forest was created by presidential proclamation dated February 13, 1909, 35 Stat. 2223, which reserved public lands of the United States within a designated area in northern Minnesota for forest purposes pursuant to Section 24 of the Act of March 3, 1891, 26 Stat. 1095, 1103; 16 U.S.C.A. § 471. Thereafter, the reservation was extended by additional proclamations. 45 Stat. 2904; 50 Stat. 1799. The lands within the boundaries of the Forest lie along and south of the international boundary separating the United States from Canada. Much of the land area is a natural wilderness containing numerous lakes and streams, and affording unique recreational opportunities. The northern boundary of the Forest runs approximately 110 miles along the Canadian border. The total area within the Forest boundaries is in excess of 3,000,000 acres or approximately 4,700 square miles. North of the border Canada has established and maintains as a natural wilderness the Quetico Provincial Park of approximately 1,000,000 acres. Although some lumbering activity has been allowed, to a large extent the wilderness part of the Forest remains in much the same condition today as in the days of the early voyageurs who traveled through by canoe.

3. The boundaries of the Forest include not only land owned by the United States but also that owned by private parties and by state and municipal authorities. Most of the land in the Forest was reserved from the public domain, although large additional areas have been acquired by the United States by purchase or exchange since the establishment of the Forest. The lands so held and acquired by the United States are administered as national forest lands. Much of the land acquired by purchase or exchange are subject to mineral rights in private persons, so that today approximately one-third of all federal ownership in the Forest is subject to such mineral reservations.

4. Numerous cities (Ely being the largest, population about 6,000), towns and villages exist in the Forest area and, along with State and county authorities, exercise their governmental power there. State, county, and federal highways exist in parts of the Forest area. An airport was established in Ely in 1929. Prior to 1938 even the remote areas of the Forest were developed with summer homes and resorts. The Secretary of Agriculture is charged with the management of public forest lands [1] and is empowered to makes rules and regulations concerning their use and occupancy.[2] The Department does not regulate or control hunting or fishing or use of the navigable waters for boating in the Forest.

5. Acting under his authority to prescribe rules and regulations with respect to occupancy of the Superior National Forest (16 U.S.C.A. § 551), the Secre-

---

1. Act of February 1, 1905; 33 Stat. 628; 16 U.S.C.A. § 471 et seq.

2. 16 U.S.C.A. § 551.

tary of Agriculture, on September 17, 1926, announced a policy for administration of the Forest which recognized the exceptional value of large portions of it "for the propagation of fish and game, for canoe travel, and for affording recreational opportunities to those who seek and enjoy wilderness conditions." Accordingly, the Secretary stated the intention of his Department to retain as a wilderness "as much as possible of the land which has recreational opportunities." This announced policy contemplated that no roads would be built in such areas and that no recreational developments would be permitted on public lands, recognizing, however, that the Government had no power to control the use or development of private lands in the Forest. This policy also contemplated that "Not less than one thousand square miles containing the best of the lakes and waterways will be kept as wilderness recreation areas," without specific designation of the boundaries of such wilderness areas. The effect of the 1926 declaration was to establish a so-called roadless policy, i. e., that the Forest Service would build no roads through the government-owned lands having recreational value and would advocate a program of public acquisition of any private holdings in the area required for "wilderness recreation."

6. The Shipstead-Nolan Act of July 10, 1930, 46 Stat. 1020; 16 U.S.C.A. § 577 et seq., withdrew from entry all public lands in a described portion of the Minnesota boundary region, including some lands outside of the Superior National Forest, prohibited logging on public lands within certain distances of shorelines, and forbade the alteration of natural water levels of the lakes. The primary Congressional purpose of the legislation was to preserve unmodified the natural scenic beauty of the region. It did not affect use of the private lands within the area. The State of Minnesota supplemented this Act in 1933 by pro-

hibiting any alteration of the natural water levels in the region.[3]

7. On June 30, 1934, the President of the United States established the Quetico-Superior Committee under Executive Order 6783 for the purpose of coordinating the activities of existing Canadian and United States organizations interested in maintaining the wilderness character of the region. The Committee has been extended by executive orders.

8. a. On July 25, 1939, the Acting Chief of the Forest Service designated an area in the north central portion of the Forest as the Superior Roadless Primitive Area to be administered as a primitive area subject to the provisions of an accompanying plan defining the precise boundaries and detailing a management policy. All of the resorts involved in these suits are located within the Superior Roadless Area (name used in the plan to describe the same area designated by the Acting Chief of the Forest Service as the Superior Roadless Primitive Area) and were acquired from the United States by the plaintiff resort owners or their predecessors in title prior to 1939. Hereafter, when the term "roadless area" is used in the singular it will refer to the Superior Roadless Area. The following excerpts from the approved plan are relevant to the issues in these suits:

"It is the intent of this plan to supply the facts essential to a rededication of the present Superior Roadless Area without changing the basic policy approved for the original 'Wilderness Area.' The purpose of this classification of the forest as taken from the National Forest Manual, page 61 L–5, is as follows:

" 'To prevent the unnecessary elimination or impairment of unique natural values, and to conserve, so far as controlling economic considerations will permit, the opportunity to the public to observe the conditions which existed in the pioneer

3. Laws of Minnesota (1933), c. 412, Mason's Minnesota Stats. (1936 Supp.), Sec. 6602 (2), 9 Minn.Stat.Ann., Sec. 110.13.

phases of the Nation's development, and to engage in the forms of outdoor recreation characteristic of that period, thus aiding to preserve national traditions, ideals, and characteristics, and promoting a truer understanding of historical phases of national progress.'

\* \* \* \* \* \*

"All policies hereinafter established must be accepted as applying to lands under Government ownership, but the cooperation of private and State owners to follow these policies will be a major job of the administrative organization.

\* \* \* \* \* \*

"*3. Ownership.*

"The gross acreage is divided by ownership as of July 1, 1937, as follows:

|  | *Acres* |
|---|---|
| Government owned | 600,131 |
| State of Minnesota | 74,777 |
| Private land | 108,740 |
| Water | 143,510 |
| Total | 927,158 |

\* \* \* \* \* \*

"*10(b) Means of Access to Roadless Area.*

\* \* \* \* \* \*

" \* \* \* The outer rim of the Roadless Area is dotted with resorts on private as well as Government lands. The free and unrestricted use of this great water area has attracted this type of investment and development, and the interests and success of these pioneers have become a major objective of the administrative policies.

\* \* \* \* \* \*

"*11. Transportation.*

\* \* \* \* \* \*

"The development of airplanes equipped to land and take off from water surfaces has greatly changed the picture of the primitive area; and today hydroplanes working out of the adjacent territory take parties into the interior at a reasonable figure, and it appears to be a means of transportation that cannot be stopped at the present time. To a large extent, the airplane provides the Forest Service with the initial attack means of transportation on fires; and, since planes are not owned by the Government, it is necessary to secure these planes from private individuals. Contract with the Government is of insufficient size to justify planes of this description stationed at the various points without additional assistance, and it is therefore an accepted policy to allow these planes to transport private parties into the interior, and this means of income justifies the operators in stationing these planes at points convenient for Government service.

\* \* \* \* \* \*

"*b. Truck Portages:*

"Where resorts have been developed in the Roadless Area, or where not accessible by automobile, private initiative has developed portages passable by automobiles. The most conspicuous portage of this description connects Fall Lake with Basswood Lake, \* \* \*. The Government constructed approximately a mile and a half of new portage, so that it is passable by automobiles, and the four miles is now located on a public thoroughfare, and the public has free use of this thoroughfare. Since this type of usage was in place prior to the extension of the Roadless Area boundaries to include this territory, it is an accepted form of use within the Roadless Area boundaries. \* \* \*.

\* \* \* \* \* \*

"No roads will be constructed except purely temporary roads incident to the removal of forest products. Such temporary roads will be built and maintained only at the time forest products are actually to be removed.

\* \* \* \* \* \*

"*2. Improvements.*

" \* \* \* The private development within the area is generally

located on privately owned lands, over which we have no jurisdiction. * * *.

* * * * * *

"3. Developments under Permit.

"No special use permits for occupancy will be issued within the wilderness area where such occupancy is for recreational purposes. This excludes all types of summer homes, resorts, or semipermanent shelters on Government owned lands within the area. * * *.

* * * * * *

"5. Secretary's Policy.

"Policies governing the administration of the original Superior National Forest Wilderness Area as set forth by the Secretary of Agriculture will be adhered to in this rededicated area. These policies are, specifically:

"(a) Preservation of the unique natural and scenic values within the Superior National Forest.

"(b) Increase of recreational stability of the region by the safeguarding of recreational advantages.

"(c) Development of a truer understanding of the historical phases of the Nation's progress by preventing the destruction of primitive conditions typical of early American existence."

b. The existence of the federal wilderness policy as to roads in the roadless areas of the Forest was a matter of common knowledge for several years prior to 1939 and was a source of dissension between those who wanted to provide access to the lakes by road and those who preferred the wilderness to remain in its primitive state. The plaintiffs knew or should have known of the roadless policy throughout the periods of their ownership of the properties involved in these suits.

9. On April 21, 1944, the Board of Commissioners of St. Louis County, Minnesota, adopted, and subsequently duly published, a zoning ordinance which prohibited the future construction, occupation or use of any building as a home (except for hunting, fishing or summer residential purposes, or unless it would be solely used in connection with a mine, quarry, gravel pit, hydro dam, private dam, flowage area, transmission line or substation) in a large part of the roadless area of the Forest, including the land of plaintiffs Skala and Zupancich. The purpose of the ordinance was to discourage individuals from making their homes in remote areas of the county and thereby placing a burden on the county with respect to road construction or the furnishing of school service.

10. On February 13, 1948, a plan of management for the three roadless areas in the Forest (namely, the Superior, Little Indian Sioux, and Caribou roadless areas), which had been originally developed and approved by the Acting Chief of the Forest Service on July 25, 1939 (finding 8, supra), was reaffirmed by the Secretary of Agriculture in the same form except for minor changes in boundaries and logging restrictions. At that time 26 percent of total land areas included in the roadless areas of the Forest was in nonfederal ownership, of which 14 percent, or about 185 square miles, was in private ownership. In general, the plan, which pertained only to government-owned land in the roadless areas, (a) prohibited logging in certain sections and restricted logging in other sections so as to preserve wilderness characteristics, (b) prohibited occupancy permits except for removal of timber and minerals and for conduct of public business, (c) prohibited roads except those "essential in exercising the lawful rights of ingress and egress" and required removal of temporary logging roads in cutting areas after their purpose had been served, (d) prohibited airplane landing strips and closely restricted landing of airplanes on national forest land or water, (e) limited dock construction, and (f) imposed certain restrictions as to construction of dams. The plan recognized recreation to be the third ranking industry in Minnesota and of major economic importance to citizens in the

northeastern part of the State. The following excerpts from the plan of management are relevant to the issues in these suits:

"This development [i. e., of private resorts in the roadless area] has taken place over a considerable period of time, beginning with the wane of lumbering along the border waters. Recently, however, there has been an accelerated rate of development, due mainly to the increased availability and use of aircraft for ingress and egress. The result has been the invasion of several lakes with high wilderness value which were previously free of development, thus seriously reducing the truly remote and primitive portions of that roadless area.

\*   \*   \*   \*   \*   \*

"Many of the complicating factors result from the mixed ownership, especially the presence of considerable areas of privately owned land. These holdings represent appropriations of long standing, and in connection with many of them, particularly lake shore properties, certain types of improvements, use and transportation have developed through the years in a perfectly lawful manner and from quite legitimate motives. Recent expansions of development, particularly to lakes heretofore undisturbed, force attention to the significance of the private land situation. Incomplete public ownership cannot effectively curb additional development regardless of how desirable that objective is.

"Another complicating factor is the growing use of hydroplanes. It is a critical threat to the remaining wilderness qualities of the area and to such native resources as fish and game. It is a stimulant to the development of heretofore undisturbed areas. Control of the use of navigable waters is not vested in abutting ownerships, hence federal land controls can have but a very indirect and generally ineffective influence on the situation.

\*   \*   \*   \*   \*   \*

"C.   *Roads and Landing Strips*

"1.   Except as it may be held essential in exercising the lawful rights of ingress and egress, no roads other than those required for the removal of timber, mineral and other resources shall be permitted. \*  \*  \*.

\*   \*   \*   \*   \*   \*

"3.   No aircraft landing strips shall be permitted.

"D.   *Use of Area by Aircraft and Motorboats*

"The landing of airplanes on national forest land or water and the use of motor boats on national forest waters will be closely restricted. Both will be prohibited except in the areas where the employment of such facilities by the public has already become well established. \*  \*  \*.

\*   \*   \*   \*   \*   \*

"A.  \*  \*  \*  However, federal purchase of certain types of tracts, such as where improvements account for the major portion of the value, is not clearly authorized by any existing law. Such legislation is needed.

"B.   *Use of Aircraft*

"It is generally recognized that the increase in the use of hydroplanes constitutes a critical threat to the qualities that make the areas outstanding. Were such use confined to travel to resorts and summer homes, it would not necessarily be too serious. However, there is a constantly growing plane traffic to and from all portions of the area that afford water surfaces adequate for landing and taking off. Thus, there is an increasing, and potentially unlimited, disturbance of the qualities of remoteness, quietness, and solitude that furnish much of the charm of the areas. The resulting pressures on fish population have already been mentioned. Much of

the business involves but short visits to the areas, often but a day or less, and thus by-passes the resorts in the areas. It can be expected eventually to by-pass in large measure even the communities in adjacent areas. Although already given some study, authority for control over navigable waters not under the jurisdiction of the Forest Service is not yet clear, and as yet no concrete plan has been evolved. There is definite need for further and specific attention to this problem."

11. Prior to the Thye-Blatnik Act of June 22, 1948, 62 Stat. 568, 16 U.S.C.A. §§ 577–577h, all federal land acquisitions in this area had been paid for with funds appropriated under the Weeks Law of March 1, 1911, 36 Stat. 962 et seq., 16 U.S.C.A. § 516 et seq. Land acquired under the Weeks Law was acquired for the protection of watersheds of navigable streams or for the production of timber. Very little funds were available for purchase of lands in the Superior National Forest and almost no funds were available for land purchases in the roadless areas. The Department of Agriculture doubted the availability of funds to purchase improved lands. However, during this period some private lands in the area, including some resorts, were purchased by the Izaak Walton League Endowment, Incorporated, in order that property so purchased could eventually be turned over to the United States when federal reimbursement funds became available.

12. In 1948 the Thye-Blatnik Act, supra, authorized the appropriation of up to $500,000 to purchase privately owned land, including land in all of the Little Indian Sioux and Caribou roadless areas and the majority of the Superior roadless area. The Act exempted from condemnation any privately owned tract of less than 500 acres improved with a

permanent-type dwelling. The purpose of the Act was to conserve the "unique qualities and natural features of the remaining wilderness canoe country." The Act also regulated logging, limited alteration of natural water lake levels, and authorized the exchange of government-owned lands for private lands. The Act of June 22, 1956, 70 Stat. 326 (P.L. 607, 84th Cong., 2d Sess.), increased the authorization for appropriations to $2,500,-000 and expanded the purchase area to be coextensive with all three roadless areas in the Forest. By the time of trial the United States had purchased 14 resorts in the roadless area, and there remained in the roadless area about 18 privately owned resort and residential properties with substantial improvements.

13. On December 17, 1949, Executive Order No. 10092, 14 F.R. 7637, was promulgated, creating an airspace reservation over the so-called roadless areas of the Superior National Forest. The pertinent provisions of this Order, referred to hereafter as the "airban order" or "airban," are as follows:

"1. The airspace below the altitude of 4,000 feet above sea level over the following-described areas in the counties of Cook, Lake, and St. Louis, State of Minnesota, is hereby reserved and set apart as an airspace reservation: [4]

"Those areas of land and water within the exterior boundaries of the Superior National Forest which have heretofore been designated by the Secretary of Agriculture as the Superior Roadless Area, the Little Indian Sioux Roadless Area, and the Caribou Roadless Area, respectively, and which are more particularly described as follows:

\* \* \* \* \* \*

"2. After January 1, 1951,[5] no person shall navigate an aircraft

---

4. Surface elevations of the roadless areas range from 1,000 to 2,230 feet above sea level. Thus the airban elevations above ground level would range from 1,770 to 3,000 feet.

5. Effective January 1, 1952, as to present plaintiffs.

within this airspace reservation except in conformity with the provisions of this order and as permitted by or under the authority of regulations prescribed by the Secretary of Agriculture."

The foregoing Order was issued pursuant to Section 4 of the Air Commerce Act of 1926, 44 Stat. 570; 49 U.S.C.A. § 174. Its primary purpose was to eliminate resorts from the roadless areas of the Forest in order to help preserve their wilderness character for enjoyment of visitors employing primitive means of transportation and subsistence. It had no relevancy to the promotion, encouragement, or regulation of the use of aircraft in commerce.

### Claim of John D. Hanson
### (Quetico Lodge)

14. a. In 1943 plaintiff John D. Hanson bought for $1,500 six islands in upper Basswood Lake in a part of the Superior roadless area bordering Canada. A predecessor in title had acquired the property from the United States in 1932. The six islands comprise 44.13 acres of land, with approximately two miles of shoreline. Hanson informed the Forest Service of his intention to build a resort on one of the islands and to bring in his guests and supplies by air. From 1945 to 1951 he built on one of the islands a home and resort known as Quetico Lodge, a group of 14 structures consisting principally of a main lodge, three cabins, electric plant, fish house, motor house, floating dock, seawall, fuel storage facility, employees' cabin, small shop, three cesspools, and a sawmill. The resort was well-equipped and furnished, and enjoyed all modern conveniences such as hot and cold running water, plumbing, telephone, etc. It commenced operations in the late summer of 1947.

b. Prior to January 1, 1952, the effective date of the 1949 airban order, guests were flown into the resort from Ely by air service provided on contract by co-plaintiff Elwyn West, who charged guests $10 per round trip for the 15-minute flight and, in exchange, flew in equipment and supplies for Hanson without charge. Some guests arrived in their own private planes.

c. Since the effective date of the airban Hanson has had to bring his guests in to his lodge from Ely over land and water. They travel by motor vehicle six miles from Ely to Fall Lake, then by boat six and one-half miles across Fall Lake to the Four Mile Portage, then across the Portage by motor vehicle to the lower end of Basswood Lake, then from there by boat to Quetico Lodge 13 miles away in the upper end of Basswood Lake. In good weather the trip takes two to three hours each way, requires loading and unloading passengers and freight each time a change is made from land to water transportation and vice versa, and costs Hanson about $15 per round trip for fuel and maintenance of his vehicles. Hanson charges each guest $10 for the trip and makes about 100 trips each season, many of them solely to haul supplies. The charge to guests does not always cover the immediate cost. Conduct of the alternate transportation consumes time which Hanson could spend more profitably in catering to the needs of his guests. The alternate method of transportation necessitated by the airban caused Hanson to invest approximately $8,000 in the purchase of land and water vehicles and the building of a dock site, living quarters and parking space at Winton, for none of which he had need prior to the airban. He also rented additional dock sites and parking spaces from a private owner at each end of the Four Mile Portage. Because of the elimination of air access he moved his family during the off-season periods from Quetico Lodge to quarters built at Winton.

d. Hanson built his resort and all of its facilities almost exclusively with his own hands. His total investment, including an estimated allowance for his own labor, has been approximately $45,000 as follows:

| | |
|---|---|
| Structures and furnishings | $28,000 |
| Boats, canoes, outboard motors | 6,000 |
| Tools | 1,500 |
| Launches, vehicles and accommodations due to lack of air access | 8,000 |
| Original cost of land | 1,500 |
| | 45,000 |

e. Hanson's lodge has a 20-guest capacity and is open from about May 15 to September 15 of each year. Gross receipts from the resort operation increased from $3,864.51 in 1948 to $7,852.87 in 1956. Receipts substantially declined during the years 1951–1953 due in large part to Hanson's recall to the Air Force for 31 months starting January 1951. During the period of his absence his wife endeavored to keep the lodge in operation. The airban order took effect during this period. With the 1954 season Hanson had to commence building a new clientele, for after the effective date of the airban, few of his former airborne guests returned. There is reason to believe that his receipts would have been increased over the actual in the post-ban years had it not been for the ban on flights.

f. Estimates of the fair market value of the land and fixed improvements at Quetico Lodge, assuming access by air, varied from $20,750 to $35,000 in both 1951 and 1957 according to defendant's two witnesses, and from $31,590 to $196,628.03 in 1949 and 1951 according to plaintiff's two witnesses. Defendant's witnesses found no decline in market value because of the airban, while Hanson's two witnesses found resultant values of $98,314 and $8,298, respectively. The fair market value of Hanson's property, with and without access by air, is reported in finding 20.

### Claim of Jacob Pete (Pete's Fishing Cabins)

15. a. In 1935 the plaintiff Jacob Pete started a business on leased land lying on the shore of Hoist Bay on Basswood Lake at the terminus of the Four Mile Portage. On this land he erected some structures from which he operated so-called "cabin boats" on Basswood Lake. Subsequently, sometime in the 1940's, he acquired an undivided one-quarter interest in three and one-half acres of land fronting 500 to 600 feet on Hoist Bay and adjoining the land which he had previously occupied under a lease. The remaining three-quarters undivided interest in the property was privately owned by others until about 1956, when the United States acquired title to an undivided one-quarter interest by buying it from the private owner. Pete is billed and pays real estate taxes on his one-quarter undivided interest. None of the other co-owners of the property have made a claim to any part of the improvements which Pete has placed on the property, or to any part of the income derived from Pete's use of the improvements. Although Pete is the record owner of the one-quarter interest in the property from which he conducts his individually owned and unincorporated business known as Pete's Cabin Boats, from 1948 through 1953 Pete's son, James W. Pete, reported the income and expenses from the business as his own, and they were not reported on the plaintiff's income tax return until starting in 1954 and thereafter when, at the instance of the Internal Revenue Bureau, the business income and expenses were reported on the returns of the plaintiff Pete. *The foregoing facts are based not upon best evidence, which was not offered, but upon testimony which was not objected to.*

b. After acquiring his one-quarter undivided interest of land described above in the 1940's, Pete erected thereon at his own expense six frame buildings, including a cabin, storage building, combination warehouse and storage building, oil house, boat shed and icehouse. He built a large dock, a retaining wall, and filled in swampy areas of the shoreline. By 1949 he had built at the site five cabin boats, i. e., a five-guest dwelling erected on a water-borne barge, furnish-

ed for simple housekeeping, and equipped with inboard motors for propulsion. In 1954 he installed one of the cabin boats in a fixed location on shore, and replaced it on the water with a ten-guest double decker cabin boat. His cabin and cabin boats have a total capacity for 45 guests. Guests fish from the cabin boats which cruise around Basswood Lake and accessible waters as far as 28 miles from base, sometimes in Canadian waters. Pete has also installed tracks leading from the water to the shore of the property for the purpose of hauling the cabin boats up on land for repairs. He owns a launch for the purpose of hauling guests across Fall Lake to the near end of the Four Mile Portage, and a speedboat to carry his guests from his property to the cabin boats wherever they may be located on Basswood Lake.

c. Commencing in 1943 and continuing to January 1, 1952, as many as 25 percent of his guests flew in by seaplane and landed on Basswood Lake either at the docks or directly to the immediate location of the cabin boats. The guests paid the flying service for this transportation, which was thus no expense to Pete. All other guests were transported from Ely via Fall Lake and the Four Mile Portage by launch and bus, at Pete's expense but included in his rates. Since January 1, 1952, all guests have come in by this means. Prior to the airban Pete also received some supplies by air. Many of his guests were business and professional men who, pressed for time and able to spend only a day or two of recreation, found the flying service well adapted to their time limitations and more convenient than alternate means of transportation. Most of the airborne guests no longer patronize Pete's facilities since the effective date of the airban.

d. It cannot be determined with any accuracy what Pete's investment has been. He estimated a total cost investment of $45,797, including $10,000 for improvements in place on the land and $21,787 in cabin boats, but there is no way to verify these costs. As of 1949 his income tax return reflects for equipment alone an original cost of $13,404.41, depreciated to $7,143.47, while the same figures for 1951 are $13,510.01 and $3,900.52.

e. Based upon federal income tax returns, plaintiff's gross receipts from the operation of Pete's Cabin Boats have risen each year from 1948 through 1956, and each year a net loss has been reported, despite Pete's irreconcilable testimony that profits have been made. In 1956 the number of guests reached the same as the previous peak in 1950. Whether the number of guests in the years 1952, et seq., would have been greater than actually experienced if air access were permitted is a matter of conjecture. Pete's investment in equipment increased from $13,510.01 in 1951 to $34,957.04 in 1956.

f. Estimates varied widely as to the market value of Pete's property with and without access by air. His expert witness testified to market values of $21,325 (including $5,000 for land value) with air access and 25 percent less or about $16,000 without, as of December 1949, the promulgation date of the airban. Defendant's two experts found values of $14,450 and $11,000, respectively, as of both 1951 and 1957, finding no loss in value because of the airban. None of the estimates included a figure for cabin boats and personal property such as equipment. The fair market value of Pete's property is reported in finding 20, *infra*.

Claim of Martin Skala (Lac LaCroix Lodge)

16. a. In 1944 plaintiff Martin Skala bought 8½ acres of land for $300 on Lac LaCroix in the northwest corner of the roadless area. It has about 1,500 feet of lakeshore frontage and includes a sand beach. By 1949 he had built, with the knowledge and without the opposition of the Forest Service, a resort known as Lac LaCroix Lodge, consisting of 17 buildings, including a large lodge,

dormitories, four cabins, icehouse, warehouse, two light plants, root cellar, pumphouse, docks, and septic tanks. The resort has capacity for 70 guests, is of superior construction, and has all modern conveniences. It was designed exclusively as an air resort and, until June 1953, all guests were flown in from Ely by co-plaintiff West's flying service under an arrangement whereby the guests paid West $11.50 round trip and West flew in freight and supplies to Skala free of charge. The resort is in operation from about May 15 to September 30 of each year, depending on the weather.

b. Since the cessation of flights into the property occasioned by the airban, all guests have been brought in to the lodge by plaintiff at a round trip charge of $11.50 by either the Loon Lake route or the Dawson Portage route. Both routes originate at Crane Lake just outside the western extremity of the roadless area, in a building which Skala bought and improved for that sole purpose at a cost of $8,500. He keeps a full-time employee there during the season. From the cessation of flights in June 1953 until the Dawson Portage route became available during the 1954 season, Skala transported his guests over the Loon Lake route, which went by boat from the Crane Lake depot, followed the Canadian border down Vermilion River and into Loon Lake, thence into Lac La-Croix to the lodge location, crossing over two land portages en route which necessitated the payment of $3 in toll charges for the portages. Due to distances, low water levels in the early spring and fall making Vermilion River non-navigable, and generally hazardous conditions, the Loon Lake route became and is impracticable and not used so long as the Dawson Portage route is available. The Dawson Portage route also originates at Skala's Crane Lake depot, proceeds by boat seven miles across Crane Lake to Dawson Portage, stopping en route at the Canadian customs, then four miles by truck across Dawson Portage to Lac LaCroix, thence 20 miles by boat across Lac LaCroix to the lodge, a total of 31 miles and two and one-half to three hours from the Crane Lake depot, as contrasted to a 25-minute flight from Ely to the lodge, and a five-hour surface trip via the Loon Lake route. Passengers and freight must be unloaded and reloaded several times during both the Loon Lake and Dawson Portage routes in transferring from land to water and vice versa. The Dawson Portage is in Canadian territory and Skala uses it only at sufferance of the Canadian authorities. In order to use it he had to build a truck road across the four miles of ground which beaver dams repeatedly flood and cause Skala continual maintenance costs. Skala has expended approximately $39,000 [6] in operating the transportation system across the Dawson Portage route, including the cost of building the truck road, hiring employees during the season to man the boats, vehicles and depots, and purchasing and maintaining equipment and facilities, including the Crane Lake depot, two boats on Crane Lake, docks at Dawson Portage, four trucks, two tractors, grader, two trailers, loader, and gasoline storage facilities on Dawson Portage, and three boats on Lac LaCroix. He also expended $2,200 for a radio telephone service between his lodge and the Crane Lake depot. These expenses and items of equipment were exclusively attributable to the Dawson Portage transportation system and Skala would not have had them had it not been for cessation of flights into his resort due to the airban. Their salvage or market value is not shown. Skala charges his guests a round-trip transportation fee of $11.50 and does not know if this reimburses his costs. Skala also transports, for an undisclosed fee, co-plaintiff Zupancich's guests from Crane Lake to the end of the Dawson Portage.

c. Cessation of flights into the resort has had a positive but unmeasurable adverse effect on plaintiff's volume of guests, although for other reasons the volume in 1956 was greater than in the last full year of flight operations. About

6. Not verifiable from records, but believable.

5 percent to 10 percent of the former airborne guests continue to patronize the resort, so that since the end of the flights plaintiff has accumulated a substantially new clientele. In no year has he operated at greater than an estimated one-third capacity. It is logical to assume that in the post-flight period he would have had more guests if flights had continued. Flight service made the lodge accessible to many elderly guests who now find the present transportation system too exhausting and so no longer patronize the resort.

d. Up until the cessation of flights in 1953, Skala had invested approximately $50,000 in his property, excluding some of the equipment previously acquired and all of the equipment and facilities acquired in connection with the existing transportation system.

e. Income tax returns for the years 1948 through 1956 commingle receipts and expenses of the lodge and a tackle store in Ely owned by Skala, but it is inferable from them that in each year except 1953 the resort has returned a profit. Gross receipts in each of the post-flight years have exceeded those in preceding years, this being attributable to greater promotional efforts, improved economic conditions, and increasing recreational activity at large. Throughout, expenses have maintained a fairly stable ratio to receipts. Volume of guests remained fairly constant until 1956, when there was a pronounced increase. Skala's records and income tax returns contain many inconsistencies and ambiguities not satisfactorily explained in the record, and the foregoing facts reported in reliance on them are subject to some doubt.

f. Valuation estimates provided by the expert witnesses varied widely. Defendant's two witnesses found respective market values of $99,725 and $115,000 for the land and fixed improvements (excluding all equipment, personal property, and the Crane Lake depot), with or without access by air, as of both 1951 and 1957. Plaintiff's two witnesses found

values for the same of $195,776.10 and $114,716, respectively, with access by air, as of 1949 and 1951, and $97,888.05 (a 50 percent decline) and $50,000, respectively, without access by air. The fair market value of the Skala property is reported in finding 20, *infra*.

Claim of William Zupancich (Curtain Falls Fishing Camp)

17. a. In 1939 plaintiff William Zupancich paid $1,500 for a 56-acre tract of land situated in the roadless area and fronting 9,900 feet on Crooked Lake and Curtain Falls, a highly scenic location. Curtain Falls separates the property from Canada. With the knowledge of the Forest Service and without its opposition, from late 1939 to 1950 Zupancich built a resort on the property known as the Curtain Falls Fishing Camp consisting of a lodge, twelve cabins, two dormitories, bath house, two icehouses, motor shed, pump house, tool house, and light plant. Seventy-five percent of the building materials were flown in. Much of the labor was provided without charge by his friends and relations in so-called "building bees," apparently a rural custom. Lumber was sawed at the site by plaintiff from locally available logs. The buildings were of good design and construction, had modern improvements and facilities, and a capacity for 52 guests. The resort was equipped with necessary boats and other paraphernalia required for its purposes. It was designed exclusively in contemplation of guest transportation by airplane. All of its guests were flown in from Ely until June 1953, when legal proceedings based upon the defendant's earlier ban on flights terminated further flight activity. Thereafter until June 1955 Zupancich brought his guests in over land and water using the Gun Lake Road, a temporary logging road belonging to the Northwest Paper Company which, by permit issued by the Forest Service in 1950, was extended a few miles into the roadless area. At the instigation of the United States a locked gate barred access into the roadless area, but Zupancich and Perko, an-

other resort owner, violated the gate on numerous occasions and drove into the roadless area with vehicles and heavy construction equipment in order to get to waters giving access to their properties. Zupancich and Perko brought suit and, in May 1955, were denied their motion for a temporary injunction seeking to restrain the Northwest Paper Company and the Forest Service from denying them access to the logging road. Perko v. Northwest Paper Company, Inc., D.C., 133 F.Supp. 560. Despite this, use of the route was continued by the unsuccessful plaintiffs and, in July 1955, the court granted a temporary injunction to the United States preventing any further use of the route by Zupancich and Perko, and indicating that packhorses, canoes, and walking were the only means of access available to their resorts, even though the use of vehicles on portages by resort owners elsewhere in the roadless area was found by the court to be discriminatory. United States v. Perko, D.C., 133 F.Supp. 564. For a two-week period in 1954 Zupancich landed guests by plane in nearby Canadian waters and ferried them across the Lake to his resort, but the Canadian authorities prohibited this means of access. Since June 1955 all of his guests have arrived and departed via the Dawson Portage route used by co-plaintiff Skala and described in finding 16, *supra*. Skala transports Zupancich's guests as far as the Bottle Lake Portage lying between Lac LaCroix Lodge and the Curtain Falls Fishing Camp, and from that point Zupancich transports them by boat and portage to his property. In doing so he has to cross two and sometimes three portages, one of them on Canadian soil, and has to negotiate three hazardous rapids by boat. Solely for this purpose Zupancich acquired and maintains three boats and one amphibious jeep. The route from Crane Lake to his resort thus covers 41 miles and involves three and sometimes four land portages, two of them across Canadian soil, and three rapids. Traveling from his home in Ely to his resort property Zupancich must drive 93 miles to Crane Lake and then proceed 41 more miles to the resort in the manner described. Passengers and freight must be loaded and unloaded each time a change of vehicles is made, land to water type or vice versa. The resort lies about 25 minutes from Ely by air. The Forest Service has denied him the use of two portage trails across government-owned land in the roadless area which would somewhat ease the transportation problem.

b. In 1952 the depreciated cost of his land, improvements, and equipment was $48,000. The salvage value at that time is unknown. It is not likely that any purchaser except the Government could be found for the resort since the cessation of flights. In 1946 the Izaak Walton League of America contracted to purchase the entire property from Zupancich for $65,000, but the negotiations collapsed for reasons not clear in the record. After the flight ban the Forest Service offered to pay him $75,000 for the land and fixed improvements, which he declined. The offer is still open.

c. Zupancich operates his resort from early May to mid-October of each year, weather permitting. Prior to 1953 he would accommodate duck hunters in the fall. Gross receipts from the operation of the resort grew steadily through the year 1952, the last full year of air access, when they reached $57,383.64, then dropped to approximately one-half in succeeding years through 1956. Similarly, plaintiff earned profits on the resort through 1952, and has shown a loss or a minute profit in each succeeding year through 1956. The number of guests dropped radically after 1952, reaching a low figure in 1955 of less than one-third the number in 1952. Without doubt lack of access by air has been chiefly responsible for the diminished patronage of plaintiff's resort.

d. Estimates of value by expert witnesses varied widely. Plaintiff's two witnesses valued the fixed improvements alone, with air access, to be $73,201.20 and $36,900, respectively, as of their se-

lected dates of December 1949 and December 1951, and found a decline to $36,600.60 and $7,380, respectively, on the same dates without air access. They estimated land values at about $90,000 and $46,200, with air access, and about $45,000 and $9,240 without. Defendant's two witnesses found market values of the land and fixed improvements in 1951 and 1957 to be $51,835 and $75,000, respectively, and found them to be affected neither by the difference in time nor by loss of air access. The fair market value of the Zupancich land and fixed improvements is given in finding 20, *infra*.

Claim of Leithold Seaplane Service, Inc.

18. a. In 1936 William Fred Leithold, subsequently president of plaintiff Leithold Seaplane Service, Inc., contracted with the Forest Service to furnish seaplane flying services from Ely, Minnesota, to assist in the fire control program for the Superior National Forest. The contract was renewed for several years. Concurrently he operated from Ely in his individual capacity a commercial flying service, and from 1936 until 1947 he made many commercial flights carrying passengers and freight into the roadless area for resorts, private homes, logging operators, and on Forest Service missions. Operating only seaplanes, he would land on and take off from the lake surfaces in the roadless area, for in those years and up through 1951 air transportation was utilized widely as the most convenient mode of travel into the roadless area. As early as 1937 Leithold was familiar with the Forest Service policy to maintain this part of the forest in its natural state and as a roadless area. In 1946 he procured by license from the owner the use of some land and three frame buildings on Shagawa Lake at Ely, for use as a seaplane base, with the provision that he would have to remove the frame buildings and any other structures on the land at the termination of occupancy. In 1947 he, with others, formed the plaintiff corporation under the laws of Minnesota, to carry on the same business as theretofore carried on by Leithold in his individual capacity. He transferred to the corporation several seaplanes and equipment with a book value of $36,000, receiving in return $10,000 in stock of the new corporation and an assumption by the latter of debts against the transferred seaplanes. The plaintiff corporation operated its flying service in the same manner as had Leithold, entered into successive licenses for the occupancy of the seaplane base (including a promise to remove all structures upon termination of the agreement), and in 1948 built a five-plane aluminum hangar, a ramp and docks on the property. The plaintiff conducted a flying school under a Veterans Administration program during the winters of 1948 and 1949, and in 1949 secured a permit from the State of Minnesota to fly passengers and freight into the roadless area and elsewhere. By 1949 and in succeeding years approximately half of the business of plaintiff corporation was flying personnel, guests, and equipment into resorts in the roadless area. The other half consisted of flying fishing parties into various lakes in the roadless area where the guests would fish for usually short periods either from the seaplane pontoons or from collapsible boats carried by the planes. Permission to make flights into the roadless area was indispensable to plaintiff's business.

b. In April 1949 Leithold left the plaintiff corporation to accept employment as a pilot elsewhere. By then rumors that flying into the roadless area would be stopped had affected plaintiff's business adversely. The corporation continued in business until late 1951, just prior to the effective date of the December 1949 airban order. The corporation is still in existence, still engages the use of the seaplane base but neither uses nor maintains it, has sold its aircraft, dispersed its personnel, and has fully suspended operations since late 1951.

c. The plaintiff corporation contends that the airban order terminated its business and caused a depreciation in the value of its assets from $65,000 down to

$23,275, a loss of $41,725. However, the evidence does not establish that the seaplanes which plaintiff liquidated were sold for less than their fair market value. Nor is it established that the replacement parts, miscellaneous equipment, boats, and office equipment which were in plaintiff's closing inventory suffered a loss in value because of the airban order or that plaintiff made any effort to dispose of them except for a few boats as to which the record is unclear. The three frame buildings on the occupied property were not the property of plaintiff and cannot constitute a claim on its behalf. The plaintiff at best would be entitled only to the difference between the market value of the intact hangar, ramp, and docks in late 1951 in the absence of the airban order and its salvage value at the same time, assuming there were a right to recover anything, but the proof fails to establish either a demand or a salvage value. Finally, included in plaintiff's claim is an item of $20,380 for good will or its intangible equivalent. It is not established that the good will in plaintiff corporation, which suffered a net loss of $7,458.50 in its almost five years of operation and showed a profit in only two of those years, was worth anything. In summary, the Leithold Seaplane Service, Inc., (1) has established that the airban order of 1949 itself made it impossible to conduct its chartered business successfully, (2) has strongly indicated that the business would continue to be highly unprofitable even if flights were permitted into the roadless area, and (3) has not established that the physical assets of the corporation were depreciated below their fair market value as of late 1951.

Claim of Elwyn West (West Seaplane Service)

19. a. From 1943 until July 1953 the plaintiff, Elwyn West, conducted an individually owned business known as the West Seaplane Service from his seaplane base on Shagawa Lake at Ely, Minnesota. He had exclusive contracts with about 14 resort owners in the roadless area to fly their guests in and out by seaplane, for a fee paid by the guests. In exchange, West flew in without charge to the resort owners various supplies and materials. In addition, through at least 1950 West had yearly contracts with the Forest Service to provide plane services in connection with the forest fire control program. All but a fraction of his income, however, was derived from his transportation of guests to and from resorts in the roadless area.

b. West continued to fly into the roadless area after December 31, 1951, the effective date of the December 1949 airban order. In September 1952 the District Court issued an injunction against a continuation of these flights permitting him, however, to fly until the end of the 1952 season and to make winter flights into the roadless area landing on the lake ice. West continued his flights during the pendency of his appeal from the injunction and a subsequent petition for a writ of certiorari to the Supreme Court, both of which were denied. In July 1953 he was fined for contempt of court and three of his six planes were impounded. In the winter of 1953 he secured the release of his planes and endeavored to find another North American resort area comparable to the one in suit where he could conduct the same kind of a seaplane service. None could be found.

c. West's seaplane base on Shagawa Lake consisted of a rented hangar, another hangar and tool shop built on leased land in the winter of 1946–47 for approximately $3,500, and docks. He has been unable to use, rent or sell the latter hangar since he stopped flying. Since it was built on leased land and the record shows nothing as to ownership of the hangar, it would seem that at best West would own only the salvage value of the hangar, as to which there is no evidence. The hangar thus had no market value, but only a private value to West dependent entirely upon the existence of his lease and permission to engage in business. In December 1949 West had on hand six aircraft, all but one having been

converted to seaplanes by attaching floats and altering their tail structures at considerable expense. All planes were in operating condition at that and subsequent material times. All but the largest of his seaplanes, because of their short range and relatively large load-carrying capacity, were peculiarly adapted to the ferrying of passengers and supplies in a compact roadless lake region, such as is found in the roadless area of the Superior National Forest and nowhere else in the United States. Thus, the flight ban reduced the market value of these planes by eliminating a large share of the potential market. By the time of trial West had sold all but two of the six planes. From the flimsy evidence available it is reasonably concluded that as of December 1949 the fair market value of the six planes then owned by West was $24,000, and that the value was depreciated to $20,000 by reason of the ban on flights announced at that time. It is not shown that values in 1953 were any different.

d. In December 1949 West had on hand a supply of parts and equipment for the maintenance and repair of his aircraft. These parts, being peculiarly adapted to the needs of West's aircraft, had a greater value to the owner of those aircraft than to others. It is reasonably estimated that the fair market value of the supplies in question as of December 1949 was $1,500, and that the ban on flights depreciated their value as of the same time to $1,000.

e. West's books of account were no longer in existence at the time of trial. From his income tax returns for 1948 through 1953 it appears that gross receipts were higher in 1948 than in subsequent years, and that he showed losses in 1948 and 1953 and modest profits in the intervening years, all computed without benefit of depreciation deductions which would have reduced the profit showings. Since his gross receipts were constantly diminishing from his sixth

through his ninth year of operations, during a time when resort patronage in the roadless area was increasing, it is concluded that West's business was not a profitable business and that the value of his good will was negligible or nonexistent.

f. With flights into the roadless area being banned, the West Seaplane Service became worth only the liquidating value of its assets, and the same assets would have commanded a greater value in December 1949 had the flight ban not been promulgated. The depreciation in the value of West's business assets in December 1949 amounted to $4,500, confined to his aircraft, their supplies and equipment.[7]

### Valuation of Resort Properties

20. Preceding findings 14 through 17 set forth the essential elements provided by the record for determining the fair market value of the resorts owned by plaintiffs Hanson, Pete, Skala, and Zupancich, with and without the burden imposed by the airban order of December 17, 1949, assessed as of December 31, 1951, when the airban order became effective. It is assumed and so found that deprivation of access by air diminished the value of each of the resorts in varying degrees, largely controlled by the comparative inadequacies of other means of access. For example, the resorts owned by plaintiffs Skala and Zupancich are so remote that surface means of ingress and egress by guests are unreasonably cumbersome and expensive, while the Pete resort is more readily accessible by surface means and was planned with that means of transportation primarily in mind. The Hanson resort lies somewhere in between these degrees of inconvenience, although it operates more efficiently with air access and was planned exclusively on the basis of access by air. The expert witnesses relied on variations of the reproduction cost depreciated method in estimating values, but the authenticity of the unit cost cri-

---

7. In contrast West contended for before and after values of $54,500 and $20,650, a claimed loss of $33,850.

teria employed by them was not satisfactorily established or explained to be helpful. In some instances the suggested land values were too exorbitant and fanciful to be credible. The market data method of valuation is not applicable here because, while the record contains some evidence of private sales in the roadless area, they are not capable of comparison to the properties in suit and occurred in the main during the flight ban period when lack of air access was probably a price depressant. Purchases of resort properties by the United States in the roadless area are not properly reflective of market value for the same reason and for the further reason that the willingness of the sellers to accept the offered prices was undoubtedly influenced by the access conditions caused by the airban. However, elimination of competing resorts by Government acquisition would tend to benefit plaintiffs by a transfer of patronage. Values cannot be established by capitalization of income because of incomplete and unreliable data. In the final analysis the valuation problem is controlled by the nebulous, speculative and unascertainable factor of what would be the volume of and profit from airborne guests whose patronage of the resorts was prevented solely by the elimination of the air as a medium of access. Availability of data as to income and disbursements, reproduction costs, and other sales in the area, no matter how meticulous and complete, would not provide a reasonable formula to meet this problem. Nevertheless, based on these considerations and the evidence as a whole, it is concluded and found that the fair market value of the land and fixed improvements in the roadless area of each of the resort properties in suit, as of January 1, 1952, with and without the burden imposed by the airban order, and assuming the permanency of the present means of access,[8] is as set forth in the following table:

| Plaintiff | Property | Value as of Jan. 1, 1952 | |
| --- | --- | --- | --- |
| | | Without airban | With airban |
| John D. Hanson | Quetico Lodge | $45,000 | $30,000 |
| Jacob Pete | Pete's Cabin Boats | [1] 18,000 | [1] 14,000 |
| Martin Skala | Lac LaCroix Lodge | 130,000 | 100,000 |
| William Zupancich | Curtain Falls Fishing Camp | 100,000 | 75,000 |

[1] In which Pete has a one-quarter interest. See finding 15. These values do not include the value of the cabin boats.

8. If for example, all means of access by paying guests to the resorts in suit were terminated, the effect of the airban would amount to a total taking, even though a total shutout was not capable of anticipation in January 1952.