# United States Court of Appeals for the Federal Circuit

04-5108

AIR PEGASUS OF D.C., INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Barry S. Neuman, Barry S. Neuman, P.L.L.C., of Washington, DC, argued for plaintiff-appellant.  With him on the brief was Kathy Bailey, Bailey Law Group, P.C., of Washington, DC.

Elizabeth Ann Peterson, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With her on the brief were Thomas L. Sansonetti, Assistant Attorney General, and Katherine J. Barton, Attorney.  Of counsel was Susan V. Cook, Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC.

Nancie G. Marzulla, Defenders of Property Rights, of Washington, DC, argued for amici curiae National Air Transportation Association and Defenders of Property Rights.  With her on the brief was Roger J. Marzulla.

Appealed from:  United States Court of Federal Claims

Judge Marian Blank Horn

# United States Court of Appeals for the Federal Circuit

04-5108

AIR PEGASUS OF D.C., INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

DECIDED:  September 21, 2005

Before NEWMAN, SCHALL, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge SCHALL.  Dissenting opinion filed by Circuit Judge NEWMAN.

SCHALL, Circuit Judge.

Air Pegasus of D.C., Inc. ("Air Pegasus") appeals from the final decision of the United States Court of Federal Claims that granted the government's motion for summary judgment and dismissed Air Pegasus's complaint seeking compensation under the Fifth Amendment of the U.S. Constitution for the alleged taking of its property. Air Pegasus of D.C., Inc. v. United States, 60 Fed. Cl. 448 (2004) ("Summary Judgment"). The court granted the government's motion after determining that Air Pegasus, which had operated a heliport in the District of Columbia, did not have a

cognizable property interest "over the navigable airspace above the . . . South Capitol Street Heliport" that it alleged to have been taken. Id. at 459. We affirm.

BACKGROUND

I.

The facts of this case are undisputed. From February of 1992 to September 30, 2002, Air Pegasus owned and operated a heliport business at 1724 South Capitol Street, S.E., Washington, D.C. Air Pegasus did not own the South Capitol Street property, but leased it from Steuart Investment Company ("Steuart Investment"). The lease specified that Air Pegasus agreed to use the property

> solely in the conduct of a private use and/or public use heliport/vertiport . . . and for any uses related thereto, including but not limited to fuel sales, maintenance and repair of helicopters and other vertical take off and landing air craft and sea planes, commercial, chartered, corporate and sightseeing services and general administrative offices, and for no other purpose without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.

(Emphasis added). Air Pegasus entered the lease in February of 1992 and in due course renewed it through October 31, 2010.

As agreed in the lease, Air Pegasus only used the South Capitol Street property for the operation of its heliport. Air Pegasus did not actually operate any of the helicopters serviced by its heliport. Rather, its business was limited to providing, in return for a fee, a location from which helicopters could land and take off (and, perhaps, also obtain needed fueling and mechanical services). Air Pegasus's heliport therefore functioned much like an airport, only it serviced helicopters instead of airplanes (fixed-wing aircraft).

04-5108                                    2

Air Pegasus's heliport business was greatly affected by events following the terrorist attacks of September 11, 2001. In particular, immediately following the attacks—in which four commercial airplanes were hijacked and three were used as weapons to attack the World Trade Center and Pentagon—the Federal Aviation Administration ("FAA") used its emergency powers to shut down virtually all commercial air traffic throughout the United States. The FAA did this by issuing "Notices to Airmen," or "NOTAMs," pursuant to 14 C.F.R. § 91.139 (2001) ("Emergency Air Traffic Rules") and 14 C.F.R. § 91.137 (2001) ("Temporary Flight Restrictions in the Vicinity of Disaster/Hazard Areas").[1] The FAA's flight ban applied to both helicopters and airplanes. Therefore, by issuing the NOTAMs, the FAA essentially grounded operations at all commercial aviation ports in the days immediately following September 11, 2001.

For most aviation ports, the FAA's flight ban merely amounted to a temporary grounding of aircraft. In fact, the FAA permitted most commercial aviation ports to resume flights as early as September 13, 2001. See 68 Fed. Reg. 7684 (Feb. 14, 2003) (final rule). However, this was not the case for Air Pegasus's heliport, as the FAA's decision allowing resumption of commercial air travel specifically excluded the area within twenty-five nautical miles of Washington, D.C. See id. Although some of the

---

[1] Section 91.139 specifically authorizes the FAA to issue NOTAMs when it is "determine[d] that an emergency condition exists, or will exist, relating to the FAA's ability to operate the air traffic control system and during which normal flight operations under this chapter cannot be conducted consistent with the required levels of safety and efficiency[.]" 14 C.F.R. § 91.139(b). The section further states that "[w]hen a NOTAM has been issued . . . , no person may operate an aircraft, or other device governed by the regulation concerned, within the designated airspace except in accordance with the authorizations, terms, and conditions prescribed in the regulation covered by the NOTAM." Id. § 91.139(c).

flight restrictions in the Washington, D.C. area were subsequently relaxed,[2] much of the area's airspace is still off limits to commercial aircrafts. This includes the airspace over 1724 South Capitol Street, S.E.

Therefore, unlike most other commercial aviation ports, Air Pegasus was not able to resume flight operations after the FAA issued its initial flight ban on September 11, 2001. This caused obvious economic hardships for Air Pegasus's heliport and, on September 30, 2002, Air Pegasus abandoned its lease and ceased business operations at the South Capitol Street Heliport.

## II.

On January 10, 2003, Air Pegasus filed this lawsuit against the United States in the Court of Federal Claims, alleging that the various NOTAMs issued by the FAA after September 11, 2001, resulted in a regulatory taking of its heliport business located at 1724 South Capitol Street, S.E., Washington, D.C. (Compl. ¶¶ 14–25.) More specifically, Air Pegasus alleged that it acquired through its lease with Steuart Investment, "the legal right to operate a Heliport . . . through October 31, 2010," (Id. ¶ 4) and that "[t]he NOTAMs had the immediate and intended effect of shutting down virtually all air traffic at the Heliport . . . [which,] in turn, made it economically nonviable to continue to operate the business under the Lease" (Id. ¶ 11). Therefore, "[s]olely as

---

[2]     For example, the FAA allowed commercial flight operations to resume at Ronald Reagan Washington National Airport in October of 2001. See 68 Fed. Reg. 7684; FAA, FDC NOTAM 1/0989 (2001). On February 13, 2002, the FAA also allowed three smaller Washington-area airports—College Park Airport, Potomac Airfield, and Washington Executive/Hyde Field—to resume flight operations. See 67 Fed. Reg. 7538, 7538-39 (Feb. 19, 2002) (final rule, request for comments); see also 68 Fed. Reg. at 7684-85.

04-5108                                  4

a result of the NOTAMs," Air Pegasus alleged that "the economic value of [its] business and its leasehold interest in the Property ha[d] been destroyed." (Id.)

In response, the government conceded that the flight restrictions issued by the FAA had the effect of prohibiting helicopters from flying into and out of Air Pegasus's heliport. (Answer ¶¶ 3, 13.) However, the government denied that the restrictions resulted in a compensable taking of any property interest of Air Pegasus. In particular, the government averred that "[t]he property interest that [Air Pegasus] allege[d] [to] have been taken is not compensable under the Fifth Amendment." (Id. (second affirmative defense).)

The parties subsequently stipulated to the facts of the case and filed cross-motions for summary judgment. Air Pegasus argued that the undisputed facts showed that the FAA's flight restrictions had the effect of eliminating all economic value in its heliport and, therefore, amounted to either a categorical or non-categorical regulatory taking of its leasehold. The government, in turn, argued that the FAA's restrictions did not deprive Air Pegasus's lease of all economic value, and that even if they did have such an effect, the restrictions did not take any property that the government did not already have authority to regulate. See Summary Judgment, 60 Fed. Cl. at 453. The Court of Federal Claims ultimately sided with the government and granted summary judgment based on Air Pegasus's failure to show the taking of a cognizable property interest. Id. at 459.

The court started from the principle that, in evaluating a takings claim, a court must first "inquire into the nature of the landowner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin

with, i.e., whether the land use interest was a stick in the bundle of property rights acquired by the owner." See id. at 453 (quoting Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027 (1992) (internal quotation omitted)). The court stated that, under this inquiry, when "a party voluntarily enters into an area that is subject to pervasive government control, then a property right that would justify compensation under the Takings Clause may not exist." Id. at 453–54 (citations omitted). The court further stated that background principles of common law nuisance and property law can also provide the government with a defense to what would otherwise amount to a taking of private property. See id. at 457. That, according to the court, is because such "background principles" may place pre-existing limitations on the property owner's title. See id. (citing Lucas, 505 U.S. at 1028–29).

With respect to the facts of the case, the court first noted that Air Pegasus did not dispute the federal government's sovereignty over the navigable airspace. Id. at 456. The court further noted that the airspace over Washington, D.C., was subject to regulations when Air Pegasus entered its lease in 1992, and that "the FAA . . . [also] retain[ed] broad authority to instantly alter air flight requirements through NOTAMs." Id. Therefore, the court concluded, "Air Pegasus entered this highly regulated area, in Washington, D.C., with the knowledge that the government reserved the power, and indeed regularly exercised its power, to restrict air flight patterns and procedures." Id. at 457.

Next, the court turned to background principles of property law to determine whether any pre-existing limitations inhered in Air Pegasus's leasehold interest. The court first concluded that the federal government's dominant servitude over navigable

waterways "may constitute part of the 'background principles' to which a property owner's rights are subject and, thus, may provide the Government with a defense to a takings claim." Id. (quoting Palm Beach Isles Assocs. v. United States, 208 F.3d 1374, 1383–84 (Fed. Cir. 2000)). The court then reasoned that the government's similar exercise of exclusive sovereignty over the navigable airways indicated that it also had a dominant avigational servitude. See id. at 457–58 (citing Braniff Airways, Inc. v. Neb. State Bd. of Equalization & Assessment, 347 U.S. 590 (1954), and Northwest Airlines, Inc. v. Minnesota, 322 U.S. 292, 303 (1944)). This conclusion, the court noted, was consistent with our predecessor court's decision in Bydlon v. United States, 146 Ct. Cl. 764, 768 (1959). Summary Judgment, 60 Fed. Cl. at 458. Therefore, the court found that Air Pegasus acquired its leasehold subject to the government's dominant servitude to regulate the surrounding navigable airspace.

The Court of Federal Claims rejected Air Pegasus's argument that under the Supreme Court's decision in United States v. Causby, 328 U.S. 256 (1946), the government's use of navigable airspace can still result in a taking despite the existence of an avigational servitude. The court stated that the private property right the Court found in Causby was the right to habitable land, not the right to navigable airspace. Summary Judgment, 60 Fed. Cl. at 459. The court also rejected Air Pegasus's argument that under Palazzolo v. Rhode Island, 533 U.S. 606, 627 (2001), a takings claim cannot be barred simply because the plaintiff acquired its property interest with knowledge of an existing regulatory program. The court acknowledged that Palazzolo does not bar a claim where the federal regulation "is so unreasonable or onerous as to compel compensation," Summary Judgment, 60 Fed. Cl. at 459 (quoting Palazzolo, 533

U.S. at 627), but in this case, the court continued, "the regulatory scheme certainly is not unreasonable." Id. On the contrary, citing the grave risks to national security following the terrorist attacks of September 11, 2001, the court found that the FAA's flight restrictions were "not only reasonable, but also . . . appropriate and responsible." Id.

Accordingly, having found that Air Pegasus voluntarily chose to operate a business in a highly regulated industry, and having further found that the government has a pre-existing servitude over the navigable airspace, the Court of Federal Claims held that "[n]o [private] property right exists to public navigable airspace," and that "no property right over the navigable airspace above the leased area at the South Capitol Street Heliport [could therefore] attach to the lessee, Air Pegasus." Id. As a result, the court concluded that "although the FAA's regulatory activity may have had an adverse impact on [Air Pegasus's] heliport business," there was not a taking of any cognizable property interest of Air Pegasus. Id. The court therefore granted summary judgment to the government and dismissed Air Pegasus's complaint. Id.

Air Pegasus timely appealed the final judgment of the Court of Federal Claims. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I.

We review the Court of Federal Claims' decision to grant summary judgment de novo. Sparton Corp. v. United States, 399 F.3d 1321, 1322–23 (Fed. Cir. 2005). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. Cl. R. 56(c); Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  The issue of whether a taking has occurred is a question of law based on factual underpinnings.  Stearns Co. v. United States, 396 F.3d 1354, 1357 (Fed. Cir. 2005); Maritrans, Inc. v. United States, 342 F.3d 1344, 1350–51 (Fed. Cir. 2003); Washoe County, Nev. v. United States, 319 F.3d 1320, 1325 (Fed. Cir. 2003).  In this case, the material facts are undisputed and so we are presented with a pure question of law.

The Takings Clause of the Fifth Amendment of the U.S. Constitution states that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The purpose of the Takings Clause is to prevent "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123 (1978).  We have developed a two-part test for determining whether "fairness and justice" require compensation for burdens imposed by a particular government action.

"First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment."  Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004), cert. denied, 125 S. Ct. 2963 (2005); see also Maritrans, 342 F.3d at 1351.  That is because "only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  The protections of the Takings Clause apply to real property, see Lucas, 505 U.S. at 1019, personal property, see Andrus v. Allard, 444 U.S. 51, 65 (1979), and intangible property, see Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003–04 (1984).  However, the Constitution does not

itself create or define the scope of "property" interests protected by the Fifth Amendment. "Instead, 'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." Maritrans, 342 F.3d at 1352 (citing Lucas, 505 U.S. at 1030); see also Am. Pelagic, 379 F.3d at 1376; Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002).

"Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." Am. Pelagic, 379 F.3d at 1372; see also Maritrans, 342 F.3d at 1351. A compensable taking can occur not only through the government's physical invasion or appropriation of private property, see Lucas, 505 U.S. at 1014–15; Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), but also by government regulations that unduly burden private property interests, see Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922); Cienega Gardens v. United States, 265 F.3d 1237, 1244 (Fed. Cir. 2001).[3] Again, we do not reach this second step without first identifying

---

[3]  Regulatory takings claims are further subdivided into categorical and non-categorical takings claims. A categorical taking occurs when "all economically viable use, i.e., all economic value, has been taken by the regulatory imposition." Rith Energy, Inc. v. United States, 247 F.3d 1355, 1362 (Fed. Cir. 2001) (citation omitted); see also Am. Pelagic, 379 F.3d at 1372. Conversely, a non-categorical taking is a taking "that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use." Rith Energy, 247 F.3d at 1362 (citation omitted). Determining whether a non-categorical taking occurred involves the fact-based inquiry stated in Penn Central, specifically considering (1) the character of the governmental action, (2) the economic impact of the action on the claimant, and (3) the effects of the governmental action on the reasonable investment-backed expectations of the claimant. Lingle v. Chevron U.S.A., Inc., 125 S. Ct. 2074, 2081 (2005); Am. Pelagic, 379 F.3d at 1372; Maritrans, 342 F.3d at 1351; Conti, 291 F.3d at 1339; Rith Energy, 247 F.3d at 1362. On the other hand, compensation is due for a categorical taking if the claimant

a cognizable property interest. See, e.g., Am. Pelagic, 379 F.3d at 1381; Conti, 291 F.3d at 1340. Therefore, we now turn to the Court of Federal Claims' decision finding that Air Pegasus lacked a cognizable interest in the airspace over the South Capitol Street Heliport.

II.

A.

Air Pegasus contends the Court of Federal Claims erred in finding that Air Pegasus did not acquire a constitutionally protected property interest through its leasehold. Air Pegasus asserts that it acquired from the lease the express right to operate a heliport, and that this property right was taken as a result of the FAA's flight restrictions. At oral argument, counsel for Air Pegasus more clearly defined the asserted property right as "the right to operate a heliport, which includes the right to have a helicopter leave the ground and hit the ground," i.e., the right to have helicopters land and take off at the heliport. Air Pegasus's counsel further stated that, contrary to the Court of Federal Claims' finding, Air Pegasus does "not claim a property right in the public airspace." Rather, Air Pegasus merely claims that it acquired a leasehold interest, which explicitly included the right to operate a heliport, which "properly assumed the ability for the helicopters to use [the] airspace."

Air Pegasus further contends that, in finding no cognizable property right, the Court of Federal Claims took "a sweeping, absolutist view of the federal government's

---

(Cont'd. . . .)
can simply show that the regulation has eliminated all economically viable use of the property and that "background principles of nuisance and property law" do not independently restrict the claimant's intended use of the property. See Lingle, 125 S. Ct. at 2081 (quoting Lucas, 505 U.S. at 1030); Lucas, 505 U.S. at 1015; Rith Energy, 247 F.3d at 1362.

power under the Commerce Clause . . . [which] if allowed to stand, would seriously erode if not obliterate the value of private property in relation to government authority." In particular, Air Pegasus asserts that "[p]roperty subject to 'pervasive regulation' may still be property," and that "the federal government's navigational servitude does not provide an absolute defense to a takings claim."[4] First, with respect to the scope of the government's avigational servitude, Air Pegasus argues the servitude only extends to government actions taken to both promote interstate commerce <u>and</u> improve public avigation. In this case, Air Pegasus continues, the FAA's restrictions did not improve public aviation because, instead of promoting or improving air travel, they completely banned air travel.[5] Second, with respect to the regulated nature of the aviation industry, Air Pegasus asserts that the level of government regulation in a given industry goes to the issue of whether a taking actually occurred, not to the issue of whether the plaintiff asserted a cognizable property interest. Finally, noting that other airports in the region were allowed to open shortly after September 11, 2001, Air Pegasus contends it was singled out to bear a disproportionate burden for the sake of alleged public benefits, and that it is therefore entitled to compensation.

In response, the government argues that the Court of Federal Claims properly concluded that Air Pegasus failed to assert the taking of a cognizable property interest.

---

[4] Air Pegasus also contends that the court erred to the extent it relied on common law nuisance principles to impose pre-existing limitations on Air Pegasus's leasehold. Air Pegasus asserts that nuisance principles are simply not relevant to this case.

[5] Air Pegasus recognizes the FAA issued the flight restrictions in the interest of national security. However, Air Pegasus contends that national security interests are not included within the scope of the avigational servitude and that the government must consequently compensate individuals for property taken for such purposes.

04-5108                                              12

The government further argues that Air Pegasus's arguments on appeal confuse the difference between simply not being disturbed in a particular use of property and having an affirmative right to that use. Specifically, the government argues that while Air Pegasus's lease may have given it the right to use the land at 1724 South Capitol Street as a heliport, it did not, and could not, give Air Pegasus the right to actually operate the heliport, i.e. the right to have helicopters enter and exit the navigable airspace from the South Capitol Street site. According to the government, that is because the navigable airspace has always been subject to the exclusive and complete control of the federal government and is consequently not available for private ownership. In other words, the government's pervasive regulation of the public airways serves as one of the background principles limiting private property interests. Therefore, the government contends, Air Pegasus only had a right to operate helicopters from its heliport to the extent the FAA did not find it necessary to restrict air travel in the vicinity of Washington, D.C.

We agree with the Court of Federal Claims that Air Pegasus failed to assert a cognizable property interest for purposes of the Fifth Amendment. However, we reach that conclusion in a slightly different manner.

B.

As an initial matter, a claimant seeking compensation from the government for an alleged taking of private property must, at a minimum, assert that its property interest was actually taken by the government action. See United States v. Gen. Motors Corp., 323 U.S. 373, 379 (1945) ("[I]t has been held that the compensation to be paid is the value of the interest taken."); United States v. Miller, 317 U.S. 369, 376 (1943) ("As

respects other property of the owner consisting of separate tracts adjoining that affected by the taking, the Constitution has never been construed as requiring payment of consequential damages[.]"); Campbell v. United States, 266 U.S. 368, 371 (1924) ("[I]f the land taken from plaintiff had belonged to another, or if it had not been deemed part and parcel of his estate, he would not have been entitled to anything on account of the diminution in value of his estate. It is only because of the taking of a part of his land that he became entitled to any damages resulting to the rest."); Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking."); Klein v. United States, 375 F.2d 825, 829 (Ct. Cl. 1967) ("It is settled law that . . . compensation under the Fifth Amendment may be recovered only for property taken and not for incidental or consequential losses, the rationale being that the sovereign need only pay for what it actually takes rather than for all that the owner has lost.").

In this case, however, Air Pegasus does not appear to assert that its property was actually taken by the FAA's regulations. In particular, at oral argument, Air Pegasus's counsel conceded that Air Pegasus's takings claim was really for compensation resulting from a "derivative injury." Counsel characterized the injury as derivative because, while the FAA's regulations prohibit the operation of helicopters (and other aircraft) in the airspace around Washington, D.C.,[6] Air Pegasus does not actually own or operate any helicopters. Therefore, Air Pegasus's economic injury is

---

[6] See, e.g., FAA, NOTAM FDC 2/1261 (2002) (prohibiting "flight operations" in designated areas of Washington, D.C.); FAA, NOTAM FDC 2/1369 (2002) (same); see also 67 Fed. Reg. at 7538-39.

04-5108                                    14

not the result of the government taking Air Pegasus's property, but is the more attenuated result of the government's purported taking of other people's property. This circumstance does not form the basis for a viable takings claim. See, e.g., Gen. Motors Corp., 323 U.S. at 379; Miller, 317 U.S. at 376; Campbell, 266 U.S. at 371; Yuba Natural Res., 904 F.2d at 1581; Klein, 375 F.2d at 829; Bydlon v. United States, 175 F. Supp. 891, 897 (Ct. Cl. 1959) ("It is well-settled that consequential damages resulting from lawful government action cannot form the basis of a compensable taking.").[7]

In fact, Air Pegasus's takings claim is in many respects similar to a takings claim rejected by the Supreme Court in Omnia Commercial Co., Inc. v. United States, 261 U.S. 502 (1923). In that case, the appellant owned a contract that gave it the right to purchase a large quantity of steel from the Allegheny Steel Company at a sub-market price. Id. at 507. The contract, if performed, would have therefore resulted in a substantial profit for the appellant. However, before any deliveries were made to the appellant, the federal government requisitioned all of the steel plate produced by Allegheny Steel for the year 1918 and directed Allegheny Steel not to perform its

---

[7] Nor does this case present a situation where the government directed or authorized a third party to take adverse action against Air Pegasus. See Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1362-63 (Fed. Cir. 2002) (stating that the government is liable for third-party adverse actions under the Takings Clause only if it specifically directs or authorizes such actions). To be sure, the FAA's regulations prohibit flight in much of the Washington, D.C. area. However, this does not mean the regulations directed third parties to specifically take adverse action against Air Pegasus's heliport. On the contrary, the regulations simply state that commercial aircraft are not allowed in the restricted airspace surrounding Washington, D.C. Compare Hendler v. United States, 952 F.2d 1364, 1378–79 (Fed. Cir. 1991) (holding the federal government liable for physical takings committed by officials of the State of California, where the state officials acted solely under authority granted by federal law); Turney v. United States, 115 F. Supp. 457, 460, 463–64 (Ct. Cl. 1953) (holding the federal government liable for physical takings committed with the aid of the Philippine government).

contract with appellant. Id. The appellant subsequently sued the government in the Court of Claims, alleging "that the effect [of the government's action] was to take for the public use appellant's right of priority to the steel plate expected to be produced by the steel company and thereby appropriate for public use appellant's property in the contract." Id. at 508.

The Supreme Court held that appellant had not stated a takings claim recognized by the Fifth Amendment. The Court acknowledged that the appellant had a property right in its contract with Allegheny Steel. Id. However, the Court held that there is a significant difference between an injury to one's property interest and a taking of one's property interest:

> If, under any power, a contract or other property is taken for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable.

Id. at 510 (emphasis in original). Accordingly, the Court concluded that the appellant failed to assert a takings claim under the Fifth Amendment because the government's action had not taken appellant's contract but merely frustrated its performance. Id. at 511–13.

Similarly, in this case, Air Pegasus owns a property interest in its leasehold. However, Air Pegasus, which did not itself own or operate any helicopters, does not allege that the FAA's restrictions regulated its operations under the lease. Instead, Air Pegasus basically alleges that the FAA, by regulating helicopters owned by third parties, frustrated its business expectations at the South Capitol Street heliport. Therefore, like the appellant in Omnia, Air Pegasus, while no doubt injured by reason of

the government's actions, has not alleged a taking of private property under the Fifth Amendment.

C.

Although we have concluded that Air Pegasus's alleged derivative injury does not present a cognizable takings claim, our analysis is not quite complete. That is because, despite its noted concession at oral argument,[8] Air Pegasus nevertheless seems to claim a right of access to the navigable airspace from its heliport. (Reply Br. of Appellant at 3 ("[T]he lease also conveyed to Air Pegasus a right of access to navigable airspace from the heliport site[.]").) This use of the airspace is at least implicitly proscribed by the FAA's flight restrictions over Washington, D.C. See 67 Fed. Reg. at 7538–39. Therefore, if Air Pegasus has a private right to access the navigable airspace from its heliport, then Air Pegasus has, at a minimum, asserted a cognizable property interest allegedly taken by the FAA regulations.[9] However, for the reasons that follow, we do not think that Air Pegasus has such a private property right for purposes of the Fifth Amendment.

We first note that Air Pegasus's claimed property interest is not merely a right to access the airspace over its heliport, but a right to access the <u>navigable</u> airspace from its heliport. This means that we need not consider the extent to which Air Pegasus, as a lessee of the South Capitol Street property, has the right to use the non-navigable airspace immediately above its leasehold. See <u>Causby</u>, 328 U.S. at 264 ("[I]t is obvious

---

[8]     Specifically, as noted <u>supra</u>, counsel stated that Air Pegasus does "not claim a property right in the public airspace."

[9]     As discussed, whether the FAA's regulations actually effected a taking of that property interest would be another matter, requiring, in the first instance, a determination as to whether the effects of the regulations amounted to a categorical or non-categorical takings claim.

that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run.").[10] Our review is therefore limited to the specific issue of whether Air Pegasus has a private property right of access to the navigable airspace from the South Capitol Street Heliport.[11]

Turning to that issue, the text of the Fifth Amendment expressly states that compensation is due for government takings of "private property." However, it is well established under federal law that the navigable airspace is public property not subject to private ownership. See 49 U.S.C. § 40103(a)(2) (2000) ("A citizen of the United States has a public right of transit through the navigable airspace."); Air Commerce Act of 1926, ch. 344, § 10, 44 Stat. 568, 574 ("[T]he term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Secretary of Commerce . . . , and such navigable airspace shall be subject to a public right of freedom of interstate and foreign air navigation in conformity with the requirements of this Act."). As the Supreme Court aptly stated over a half-century ago:

> The air is a public highway, as Congress declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Common sense revolts at the idea. To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer

---

[10] In any event, the FAA's regulations do not appear to themselves prohibit Air Pegasus from constructing buildings, planting trees, or conducting other activities in the immediate reaches of the airspace over its leasehold.

[11] The FAA defines "navigable airspace" at 14 C.F.R. § 91.119 (2005). The regulation states that helicopters may fly at lower altitudes than airplanes, provided they do not pose a "hazard to persons or property on the surface." Id. § 91.119(d).

> into private ownership that to which only the public has a just claim.

*Causby*, 328 U.S. at 261 (emphasis added); *see also* *Brown v. United States*, 73 F.3d 1100, 1103–04 (Fed. Cir. 1996) (indicating that the navigable airspace is not itself a private property interest). In addition, the government has long exercised dominant control over the navigable airspace in regulating the public right of transit. *See* 49 U.S.C. § 40103(a)(1) (2000) ("The United States Government has exclusive sovereignty of airspace of the United States."); Air Commerce Act of 1926, § 6, 44 Stat. at 572 ("The Congress hereby declares that the Government of the United States has, to the exclusion of all foreign nations, complete sovereignty of the airspace over the lands and waters of the United States, including the Canal Zone.").[12] Therefore, "background principles" of long-standing federal property law indicate that there is no private property right in the navigable airspace of the United States. For that reason, we hold that Air Pegasus does not have a cognizable property interest in its alleged right to access the navigable airspace from the South Capitol Street Heliport.

We recognize that courts have found property rights in the navigable air space in limited circumstances. Most notably, in *Bydlon*, our predecessor court held that the plaintiffs had a property interest in a way of necessity to access by air land that they owned in a remote region of northern Minnesota, and that the government took that interest when it banned air traffic in the airspace surrounding their properties. 175 F.

---

[12] We note that while Congress has clearly asserted sovereignty as to foreign nations over the United States' airspace, at least one Supreme Court decision indicates that the states may retain some authority to regulate intrastate airspace. *See* *Braniff Airways*, 347 U.S. at 597 (holding that federal regulation of air commerce did not preempt a state tax on airplanes doing business in Nebraska). In any event, although *Braniff* may provide a basis for state regulation of intrastate airspace, we do not see how it provides a basis for private ownership of navigable airspace.

04-5108                                    19

Supp. at 897–900. However, the facts of that case are far removed from those of this case. For one thing, Air Pegasus does not assert to have a way of necessity by air. Moreover, in Bydlon the court actually rejected a takings claim quite similar to the one presently asserted by Air Pegasus. See Bydlon, 175 F. Supp. at 897 (holding that two airline operators failed to assert a viable takings claim because they did not own a way of necessity by air, and therefore asserted entitlement to compensation based solely on a claim to consequential damages).

In reaching our conclusion, we are also mindful of Air Pegasus's contention that the FAA acted outside of the government's navigational servitude.[13] However, our conclusion is not grounded in the government's navigational servitude. The navigational servitude is a dominant servitude. This means that, when properly invoked, the government's servitude takes priority over the underlying property interests of private parties. See, e.g., United States v. Cherokee Nation of Okla., 480 U.S. 700, 704–05 (1987) (applying the navigational servitude to preempt private interests of riparian landowners in a streambed); Kaiser Aetna v. United States, 444 U.S. 164, 175–79 (1979) (concluding that the government's navigational servitude did not provide a right-of-way through a private marina); United States v. Twin City Power Co., 350 U.S. 222, 225–28 (1956) (holding that riparian landowners took their interest in a stream subject to the government's dominant navigational servitude). Rather, our conclusion in this case is that Air Pegasus simply does not have a private property interest in what is public airspace, regardless of whether the government is acting to promote aviation.

---

[13] Specifically, as previously noted, Air Pegasus argues that the scope of the government's servitude is limited to actions taken to promote avigation, and that, in this case, the FAA's regulations fall outside of the servitude because they prohibit, instead of promote, avigation.

Therefore, because there is no private property interest here to which the government's servitude could attach, we do not see how the principles underlying the servitude are relevant to this case. See Black's Law Dictionary 1400 (8th ed. 2004) (defining "servitude" as "the right exercised by a dominant tenement over a servient tenement").

Air Pegasus also argues that voluntarily choosing to enter a regulated industry does not, by itself, deprive a person of a Fifth Amendment property interest. We agree. However, this case does not involve a typical claim to property in a regulated area. Rather, Air Pegasus claims the right to property that, since at least 1929, has been committed to the public domain. Air Commerce Act of 1926, § 10, 44 Stat. at 574. The fact that Air Pegasus was able to operate the heliport prior to September 11, 2001, is irrelevant. Am. Pelagic, 379 F.3d at 1377 ("[T]here is a distinction between simply not being disturbed in the particular use of one's property and having the right to that use of the property. Clearly, in order for there to be a cognizable property interest sufficient to support a takings claim, the latter must be true."). Private property interests simply do not, as a general matter, exist in the navigable airspace of the United States. Causby, 328 U.S. at 266 ("The airspace, apart from the immediate reaches above the land, is part of the public domain.").

Finally, we do not share Air Pegasus's concern that upholding the Court of Federal Claims' decision will provide the government with a complete "blanket" defense to takings claims involving air commerce. For example, our decision does not affect prior decisions finding takings liability where government aircraft interfered with private property interests on the ground. See, e.g., Causby, 328 U.S. at 265–67 (holding that various military overflights, which, among other things, were extremely noisy, caused

leaves to fall off plaintiffs' trees, and ruined plaintiffs' chicken-farming business, constituted a taking of the habitable use of plaintiffs' land); Argent v. United States, 124 F.3d 1277 (Fed. Cir. 1997) (recognizing that military overflights can effect a taking of property rights in the land below); Brown v. United States, 73 F.3d 1100 (Fed. Cir. 1996) (same); Branning v. United States, 654 F.2d 88, 98–102 (Ct. Cl. 1981) (stating that government action may exceed the scope of the government's avigational servitude if the action interferes with the habitable use of private land). In our decision today, we simply hold that Air Pegasus does not have a private property right to access the navigable airspace from the South Capitol Street Heliport.

CONCLUSION

We hold that Air Pegasus failed to assert a cognizable property interest sufficient to support a takings claim under the Fifth Amendment. We base our decision on two separate grounds. First, Air Pegasus appears to assert a claim based on a perceived taking of property owned by other parties. The Fifth Amendment does not provide a remedy for such a derivative claim. Second, Air Pegasus also appears to assert a right to access the navigable airspace from the South Capitol Street Heliport, access which was no doubt restricted by the FAA's regulations. We do not think this right of access is a cognizable property interest under the Fifth Amendment. Accordingly, we affirm the judgment of the Court of Federal Claims.

COSTS

Each party shall bear its own costs.

AFFIRMED

# United States Court of Appeals for the Federal Circuit

04-5108

AIR PEGASUS OF D.C., INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

NEWMAN, <u>Circuit Judge</u>, dissenting.

It is not disputed that the heliport leasehold owned by Air Pegasus lost all value upon government prohibition of helicopter traffic in the area of the National Capital. The question is not whether Air Pegasus had property, for a leasehold is property. Nor is the question whether the government had the right to close the area at South Capital Street to helicopter traffic. In exercising that right, the government directly deprived the heliport leasehold of its value. This action in the interest of national security, taken abruptly and without notice, transcended any reasonably foreseeable regulatory action. Thus the devaluation of the leasehold falls squarely within law and precedent, for a governmental taking of property rights within the cognizance of the Fifth Amendment. From my colleagues' contrary ruling I must, respectfully, dissent.

The panel majority holds that because an airport operator knowingly enters a highly regulated industry, he bears the risk of regulatory action by government. I agree. However, the act of closing the airspace around the National Capitol to helicopter traffic is not routine regulation, and it is not disputed that this action was not reasonably foreseeable. The sudden and total prohibition of Air Pegasus' business was not an ordinary regulatory act in ordinary times, but an extraordinary response to a catastrophic event. This unforeseeable governmental action rendered Air Pegasus' leasehold valueless. See Pennsylvania Coal Co. v. Mahon 260 U.S. 393, 415 (1922) ("while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking").

Air Pegasus argues that compensation is prescribed by the Fifth Amendment policy explained in Armstrong v. United States, 364 U.S. 40, 49 (1960) and in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 123 (1978), that the Amendment is designed "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." The courts are charged to consider this fundamental question: the placement of the economic burden of the government's actions in the national interest. That is, does Air Pegasus alone bear the financial consequences of enhanced security in the National Capitol, or does the nation share this burden?

My colleagues on this panel do not discuss this question, and although they agree that "Air Pegasus owns a property interest in its leasehold," Op. at 16, they conclude that the extinction of that property interest raises no issue under the Fifth Amendment. It is established that leaseholds are compensable property interests under the takings clause. See, e.g, United States Trust Co. of New York v. New Jersey, 431 U.S. 1 (1977); Sun Oil

Co. v. United States, 215 Ct. Cl. 716 (1978). And it is not disputed that the closing of the airspace to helicopter traffic deprived the leasehold of its value, raising the "clear principle of national equity that the individual whose property is thus sacrificed must be indemnified." Pumpelly v. Green Bay & Mississippi Canal Co., 80 U.S. 166, 179 (1871).

Thus the court's holding that Air Pegasus had no compensable property right is contrary to long-established precedent. Our predecessor court so recognized, holding in Bydlon v. United States, 175 F. Supp. 891 (Ct. Cl. 1959), that where the government imposed a prohibition on air traffic below 4,000 feet over the Superior National Forest for environmental reasons, resort owners who had a way of necessity through the air space in order to reach their property were entitled to just compensation. In Griggs v. Allegheny County, 369 U.S. 84, 88 (1962), the Court explained that "An invasion of the 'superadjacent airspace' will often 'affect the use of the surface of the land itself,'" quoting United States v. Causby, 328 U.S. 256, 265 (1946), settling that property rights in land may be affected by activity in the air. The panel majority departs from precedent in describing the injury to Air Pegasus as "derivative" and thus not compensable, for the injury was the direct consequence of the prohibition on helicopter traffic.

The majority deems it dispositive that air commerce is heavily regulated. However, even "pervasive" regulation does not preclude application of Fifth Amendment principles. When applying the law of regulatory takings as set forth in Penn Central, 438 U.S. at 124, it is necessary to determine how the particular government action affected the reasonable investment-backed expectations of the property owner. Central to the application of takings jurisprudence in regulated industry is the question of whether the property owner should reasonably have foreseen the governmental action, and thus is properly charged with the

04-5108                                     3

risk of its occurrence. Unlike for example the situation in <u>Connolly v. Pension Benefit Guaranty Corp.</u>, 475 U.S. 211, 226-27 (1986) (plaintiff had been on notice for years of the potential regulation), relied on by the Court of Federal Claims, Air Pegasus is surely correct that the total shutdown of helicopter activity due to terrorist attack is not an action that it should have reasonably foreseen in entering into its long-term leasehold. In <u>Cienega Gardens v. United States</u>, 331 F.3d 1319, 1331 (Fed. Cir. 2003) the Federal Circuit again explored and again rejected the argument that government action in a "pervasively regulated industry" can never constitute a taking of private rights, in that case holding that despite the highly regulated federal housing program, the enactment of legislation preventing the owners of low-income apartments from prepaying their federally subsidized mortgages after twenty years, thus freeing themselves from regulatory restrictions governing mortgages, was a taking of their property. <u>See</u> <u>also</u> <u>United Nuclear Corp. v. United States</u>, 912 F.2d 1432 (Fed. Cir. 1990) (compensable taking found in highly regulated mining industry).

The Court of Federal Claims did not reach the question of whether there was a taking, for the court based its decision on its holding that Air Pegasus had no compensable property interest because of the pervasive regulation of air traffic. Thus the trial court did not consider the regulatory factors identified in <u>Penn Central</u>, 438 U.S. at 124, <u>viz.</u>, the character of the government action, the economic impact of the regulation on the claimant, and the extent to which the regulation interfered with distinct investment-backed expectations. Although there is no question that the federal government has extensive authority over air commerce and traffic, <u>see</u> <u>City of Burbank v. Lockheed Air Terminal, Inc.</u>, 411 U.S. 624, 627 (1973) (preemption of State authority), actions of the federal government

04-5108                                          4

pursuant to its authority under the Commerce Clause can, and often do, result in takings. The fact that the federal government possesses a "servitude" in navigable space, including airways, does not insulate it from the consequences of a taking. See, e.g., Kaiser Aetna v. United States, 444 U.S. 164, 172 (1979) ("this Court has never held that the federal navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation"); Palm Beach Isles Associates v. United States, 208 F.3d 1374, 1384-86 (Fed. Cir. 2000) (same), reh'g on other grounds, 231 F.3d 1354 (Fed. Cir. 2000).

Even an environment of "pervasive" regulation does not mean that all regulatory changes will be reasonably foreseeable in that environment. Air Pegasus cannot reasonably be charged with accepting the commercial risk of the 9/11 terrorist attacks and the immediate government response by closing the airspace, which clearly were different in kind as well as degree from any reasonable regulatory limitation before 9/11. See Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 226-27 (1986) (plaintiff was on notice for years of a projected future regulation); M & J Coal Co. v. United States, 47 F.3d 1148 (Fed. Cir. 1995) (no compensation where plaintiff was barred from conducting mining operations in violation of a pre-existing regulatory standard).

The Court of Federal Claims and my colleagues appear to have been diverted by the government's concentration on the concept of who "owns" the air, thus ignoring the effect of the government action on the heliport leasehold. The result negates the basic rights and protections secured by the Fifth Amendment, and places the financial burden of emergency government action for national security, on the property owner whose property became valueless. Precedent makes clear that Air Pegasus indeed possessed a compensable

property interest in Fifth Amendment terms. From my colleagues' contrary decision, I respectfully dissent.